# COVINGTON AND CINCINNATI BRIDGE COM-
## PANY *v.* KENTUCKY.

ERROR TO THE COURT OF APPEALS OF THE STATE OF KENTUCKY.

No. 1025. Argued April 25, 1894. — Decided May 26, 1894.

This company was incorporated under an act of the legislature of Ken-
tucky, approved February 17, 1846, with authority to construct a bridge
across the Ohio at Cincinnati. The third section of the act required its
confirmation by the State of Ohio, before the corporation should open
its books for subscription; and the eighth section declared that "the
president and directors shall have the rights to fix the rates of toll for
passing over said bridge, and to collect the same from all and every
person or persons passing thereon, with their goods, carriages, or
animals of every description or kind; provided, however, that the said
company shall lay before the legislature of this State a correct state-
ment of the costs of said bridge, and an annual statement of the tolls
received for passing the same, and also the cost of keeping the said
bridge in repair, and of the other expenses of the company; and the
said president and directors shall, from time to time, reduce the rates
of toll, so that the net profits of the said bridge shall not exceed fifteen
per cent per annum, after the proper deductions are made for repairs
and charges of other descriptions." By an act of the legislature of
Ohio, enacted March 9, 1849, this company was made a body corporate
and politic of that State, "with the same franchises, rights, and privi-
leges, and subject to the same duties and liabilities," as were specified
in its original incorporation. Some subsequent legislation took place
not affecting the matter in issue here. The bridge was completed in 1867
at a cost much in excess of what had been contemplated, and has never
earned 15 per cent on its cost. On the 31st of March, 1890, the legis-
lature of Kentucky enacted that it should be unlawful to charge, collect,
demand, or receive for passage over the bridge spanning the Ohio River,
constructed under such act of incorporation, any toll, fare, or compen-
sation greater than, or in excess of, certain rates prescribed by the act,
which were much less than the directors had fixed upon under the eighth
section of the act of incorporation, and made it obligatory upon the com-
pany to maintain an office and sell tickets in Kentucky at those rates.
The company refusing to comply with the requirements of this act, an
indictment was found against it. This was demurred to, and such
proceedings were had thereafter that the defendant was adjudged guilty
and fined $1000, and the judgment was sustained as constitutional by
the Court of Appeals of the State. The case being brought here by

writ of error, it is by the whole court *Held*, that the Kentucky act of March 3, 1890, in its effect upon the Bridge Company, violated the provisions of the Constitution of the United States.

The judges concurring in the opinion of the court, (BROWN, HARLAN, BREWER, SHIRAS and JACKSON, JJ.,) after reviewing in detail the course of the decisions, announce the following as their grounds for concurring in this result and in the judgment:

(1) That the traffic across the river was interstate commerce;

(2) That the bridge was an instrument of such commerce;

(3) That the statute was an attempted regulation of such commerce, which the State had no constitutional power to make;

(4) That Congress alone possesses the requisite power to enact a uniform scale of charges in such a case, the authority of the State being limited to fixing tolls on such channels of commerce as are exclusively within its territory.

The minority of the court (consisting of FULLER, C. J., and FIELD, GRAY, and WHITE, JJ.) gave the reasons for their concurrence in the result and the judgment as follows:

(1) The several States have the power to establish and regulate ferries and bridges, and the rates of toll thereon, whether within one State, or between two adjoining States, subject to the paramount authority of Congress over interstate commerce.

(2) By the concurrent acts of the legislature of Kentucky in 1846, and of the legislature of Ohio in 1849, this bridge company was made a corporation of each State, and authorized to fix rates of toll.

(3) Congress, by the act of February 17, 1865, c. 39, declared this bridge " to be, when completed in accordance with the laws of the States of Ohio and Kentucky, a lawful structure; " but made no provision as to tolls; and thereby manifested the intention of Congress that the rates of toll should be as established by the two States.

(4) The original acts of incorporation constituted a contract between the corporation and both States, which could not be altered by the one State without the consent of the other.

THIS was an indictment found by the grand jury of Kenton County, Kentucky, against the defendant Bridge Company for demanding and collecting illegal tolls, refusing to sell tickets at the rates required by law, and for failing to keep an office for the sale of tickets at its bridge in said county.

The Covington and Cincinnati Bridge Company was incorporated under an act of the legislature of Kentucky, approved February 17, 1846, the third section of which required the confirmation of the act by the State of Ohio, before the corporation should open its books for subscription;

and the eighth section of which declared that "the president and directors shall have the right to fix the rates of toll for passing over said Bridge, and to collect the same from all and every person or persons passing thereon, with their goods, carriages, or animals of every description or kind; provided, however, that the said Company shall lay before the Legislature of this State a correct statement of the cost of said Bridge, and an annual statement of the tolls received for passing the same, and also the cost of keeping the said Bridge in repair, and of the other expenses of the Company; and the said President and Directors shall, from time to time, reduce the rates of toll, so that the net profits of the said Bridge shall not exceed fifteen per cent per annum, after the proper deductions are made for repairs and charges of other descriptions."

By an act of the legislature of Ohio, enacted March 9, 1849, this company was made a body corporate and politic of that State, "with the same franchises, rights, and privileges, and subject to the same duties and liabilities," as were specified in its original incorporation; and with a further proviso that "nothing herein contained shall be construed to take away the jurisdiction of this State to the centre of the said Bridge, nor in anywise to acknowledge the jurisdiction of the Commonwealth of Kentucky this side of the said centre."

On March 20, 1850, this act of confirmation was amended by the legislature of Ohio by granting the company "power to enter upon any lands in the city of Cincinnati, from low-water mark in the Ohio River northwardly, not exceeding one hundred feet in width, to Front Street, and appropriate the same" for passageways and abutments, etc.

The original act of incorporation was amended by the legislature of Kentucky by the following amongst other subsequent acts:

1. By act of February 23, 1856, authority was given to increase the capital stock from $300,000 to $700,000, with power in the city of Covington to subscribe for and purchase $100,000.

2. By act of February 6, 1858, the company was authorized

to issue preferred stock under certain restrictions, such stockholders to receive dividends of 6 per cent.

3. By act of February 5, 1861, the capital stock was increased to $1,000,000, one-half of such amount, in preferred stock, and to pledge the revenues of the company for the payment of dividends upon such preferred stock to the extent of 15 per cent per annum.

4. By act of January 21, 1865, the capital stock was increased to $1,250,000, the additional $250,000 being preferred stock, the holders of which should enjoy all the benefits, privileges, and immunities to which the holders of the existing stock were entitled.

By the sixth section of this act the legislature reserved the right to change, alter, or amend the original charter, " but not so as to abridge or injure legal or equitable rights acquired thereunder."

5. By act of February 25, 1865, the above sixth section was repealed.

6. By act of Congress of February 16, 1865, the bridge was declared to be a lawful structure and post road for the conveyance of the mails of the United States. 13 Stat. 431.

The bridge was completed and opened for travel January 1, 1867.

On March 31, 1890, the legislature of Kentucky passed another act amendatory of the act of incorporation, and out of which this prosecution arose, providing that it should be unlawful for any person or corporation to charge, collect, demand, or receive for passage over the bridge spanning the Ohio River, constructed under such act of incorporation, any toll, fare, or compensation greater than, or in excess of, certain rates prescribed by the act, which were much less than the directors had fixed upon under the eighth section of the act of incorporation. The second section provided that the company should sell passage tickets over their bridge at these rates, entitling the holder to passage either way over said bridge ; and by the third section, the company was required to keep an office within the county of Kenton constantly open

for the sale of such tickets; and keep conspicuously posted a schedule of the tolls fixed in pursuance of the act.

The company failing to conform to this last-mentioned act, this indictment was filed May 9, 1890. Defendant demurred thereto, and the case was submitted upon this demurrer and a statement of facts, showing the cost of the bridge structure and offices to have been $1,855,462.36; the per cent of net earnings on cost for first 23 years, 4.82; the per cent of net earnings on cost for the year 1889, 6.14; the estimated per cent of net earnings on cost for 1890, $4\frac{9}{10}$, under the charges fixed by the directors; the estimated percentage of net earnings on cost for the year 1890, under the act of which complaint was made, $1\frac{6}{10}$. The court sustained the demurrer and dismissed the indictments upon the ground that the act of 1890 impaired the obligation of the contract contained in the eighth section of the original act. The Commonwealth appealed to the Court of Appeals, by which the judgment of the court below was reversed, and the case remanded with directions to overrule the demurrer, and for further proceedings. The case was thereupon remanded to the lower court and submitted without a jury. The court adjudged the defendant guilty, and imposed a fine of $1000, from which judgment the defendant again appealed to the Court of Appeals, which affirmed the judgment of the court below, and certified, at the request of the appellant, the following questions as arising under the Constitution and laws of the United States:

1. Whether the act of 1890 was within the constitutional inhibition of laws impairing the obligation of contracts.

2. Whether such acts were in violation of the exclusive power of Congress to regulate commerce among the States.

3. Whether said act was in violation of the Fourteenth Amendment, prohibiting the taking of private property without due process of law.

Defendant thereupon sued out a writ of error from this court.

*Mr. Solicitor General* for plaintiff in error. *Mr. William M. Ramsey, Mr. James W. Bryan, Mr. John F. Fisk,* and *Mr. Charles H. Fisk* were with him on his brief.

*Mr. William J. Hendrick,* Attorney General of the State of Kentucky, and *Mr. William Goebel* for defendant in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case involves the power of a State to regulate tolls upon a bridge connecting it with another State, without the assent of Congress, and without the concurrence of such other State in the proposed tariff.

The right of the Commonwealth of Kentucky to prescribe a schedule of charges in this instance is contested, not only upon the ground that such regulation is an interference with interstate commerce, but upon the further ground that it impairs the obligation of the contract contained in the original charter of the company.

The power of Congress over commerce between the States and the corresponding power of individual States over such commerce have been the subject of such frequent adjudication in this court, and the relative powers of Congress and the States with respect thereto are so well defined, that each case, as it arises, must be determined upon principles already settled, as falling on one side or the other of the line of demarcation between the powers belonging exclusively to Congress, and those in which the action of the State may be concurrent. The adjudications of this court with respect to the power of the States over the general subject of commerce are divisible into three classes. First, those in which the power of the State is exclusive; second, those in which the States may act in the absence of legislation by Congress; third, those in which the action of Congress is exclusive and the States cannot interfere at all.

The *first* class, including all those wherein the States have plenary power, and Congress has no right to interfere, concern the strictly internal commerce of the State, and while the regulations of the State may affect interstate commerce indirectly, their bearing upon it is so remote that it cannot

be termed in any just sense an interference. Under this power, the States may authorize the construction of highways, turnpikes, railways, and canals between points in the same State, and regulate the tolls for the use of the same, *Railroad* v. *Maryland*, 21 Wall. 456; and may authorize the building of bridges over non-navigable streams, and otherwise regulate the navigation of the strictly internal waters of the State — such as do not, by themselves or by connection with other waters, form a continuous highway over which commerce is or may be carried on with other States or foreign countries. *Veazie* v. *Moor*, 14 How. 568; *The Montello*, 11 Wall. 411; *S. C.* 20 Wall. 430. This is true notwithstanding the fact that the goods or passengers carried or travelling over such highway between points in the same State may ultimately be destined for other States, and, to a slight extent, the state regulations may be said to interfere with interstate commerce. The States may also exact a bonus, or even a portion of the earnings of such corporation, as a condition to the granting of its charter. *Society for Savings* v. *Coite*, 6 Wall. 594; *Provident Institution* v. *Massachusetts*, 6 Wall. 611; *Hamilton Company* v. *Massachusetts*, 6 Wall. 632; *Railroad Company* v. *Maryland*, 21 Wall. 456; *Ashley* v. *Ryan*. 153 U. S. 436.

Congress has no power to interfere with police regulations relating exclusively to the internal trade of the States, *United States* v. *Dewitt*, 9 Wall. 41; *Patterson* v. *Kentucky*, 97 U. S. 501, nor can it by exacting a tax for carrying on a certain business thereby authorize such business to be carried on within the limits of a State. *License Tax Cases*, 5 Wall. 462, 470, 471. The remarks of the Chief Justice in this case contain the substance of the whole doctrine : " Over this," (the internal) " commerce and trade, Congress has no power of regulation nor any direct control. This power belongs exclusively to the States. No interference by Congress with the business of citizens transacted within a State is warranted by the Constitution, except such as is strictly incidental to the exercise of powers clearly granted to the legislature. The power to authorize a business within a State is plainly repug-

nant to the exclusive power of the State over the same subject."

It was at one time thought that the admiralty jurisdiction of the United States did not extend to contracts of affreightment between ports of the United States, though the voyage were performed upon navigable waters of the United States. *Allen* v. *Newberry*, 21 How. 244. But later adjudications have ignored this distinction as applied to those waters. *The Belfast*, 7 Wall. 624, 641; *The Lottawanna*, 21 Wall. 558, 587; *Lord* v. *Steamship Co.*, 102 U. S. 541.

Under this power the States may also prescribe the form of all commercial contracts, as well as the terms and conditions upon which the internal trade of the State may be carried on. *The Trade Mark Cases*, 100 U. S. 82.

Within the *second* class of cases — those of what may be termed concurrent jurisdiction — are embraced laws for the regulation of pilots: *Cooley* v. *Philadelphia Board of Wardens*, 12 How. 299; *Steamship Company* v. *Joliffe*, 2 Wall. 450; *Ex parte McNiel*, 13 Wall. 236; *Wilson* v. *McNamee*, 102 U. S. 572; quarantine and inspection laws and the policing of harbors: *Gibbons* v. *Ogden*, 9 Wheat. 1, 203; *City of New York* v. *Miln*, 11 Pet. 102; *Turner* v. *Maryland*, 107 U. S. 38; *Morgan Steamship Co.* v. *Louisiana*, 118 U. S. 455; the improvement of navigable channels: *County of Mobile* v. *Kimball*, 102 U. S. 691; *Escanaba Co.* v. *Chicago*, 107 U. S. 678; *Huse* v. *Glover*, 119 U. S. 543; the regulation of wharfs, piers, and docks: *Cannon* v. *New Orleans*, 20 Wall. 577; *Packet Company* v. *Keokuk*, 95 U. S. 80; *Packet Company* v. *St. Louis*, 100 U. S. 423; *Packet Company* v. *Catlettsburg*, 105 U. S. 559; *Transportation Company* v. *Parkersburg*, 107 U. S. 691; *Ouachita Packet Co.* v. *Aiken*, 121 U. S. 444; the construction of dams and bridges across the navigable waters of a State: *Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245; *Cardwell* v. *American Bridge Co.*, 113 U. S. 205; *Pound* v. *Turck*, 95 U. S. 459; and the establishment of ferries: *Conway* v. *Taylor's Executors*, 1 Black, 603.

Of this class of cases it was said by Mr. Justice Curtis in *Cooley* v. *Board of Wardens*, 12 How. 299, 318: "If it were

admitted that the existence of this power in Congress, like the power of taxation, is compatible with the existence of a similar power in the States, then it would be in conformity with the contemporary exposition of the Constitution, (Federalist, No. 32,) and with the judicial construction, given from time to time by this court, after the most deliberate consideration, to hold that the mere grant of such a power to Congress did not imply a prohibition on the States to exercise the same power; that it is not the mere existence of such a power, but its exercise by Congress, which may be incompatible with the exercise of the same power by the States, and that the States may legislate in the absence of Congressional regulations." See also *Sturges* v. *Crowninshield*, 4 Wheat. 122, 193. But even in the matter of building a bridge, if Congress chooses to act, its action necessarily supersedes the action of the State. *Pennsylvania* v. *Wheeling and Belmont Bridge Co.*, 18 How. 421. As matter of fact, the building of bridges over waters dividing two States is now usually done by Congressional sanction. Under this power the States may also tax the instruments of interstate commerce as it taxes other similar property, provided such tax be not laid upon the commerce itself.

But wherever such laws, instead of being of a local nature and not affecting interstate commerce but incidentally, are national in their character, the non-action of Congress indicates its will that such commerce shall be free and untrammelled, and the case falls within the *third* class — of those laws wherein the jurisdiction of Congress is exclusive. *Brown* v. *Houston*, 114 U. S. 622; *Bowman* v. *Chicago &c. Railway*, 125 U. S. 465. Subject to the exceptions above specified, as belonging to the first and second classes, the States have no right to impose restrictions, either by way of taxation, discrimination, or regulation, upon commerce between the States. That, while the States have the right to tax the instruments of such commerce as other property of like description is taxed, under the laws of the several States, they have no right to tax such commerce itself, is too well settled even to justify the citation of authorities. The proposition was first laid down

in *Crandall* v. *Nevada*, 6 Wall. 35, and has been steadily adhered to since. That such power of regulation as they possess is limited to matters of a strictly local nature, and does not extend to fixing tariffs upon passengers or merchandise carried from one State to another, is also settled by more recent decisions, although it must be admitted that cases upon this point have not always been consistent.

The question of the power of the States to lay down a scale of charges, as distinguished from their power to impose taxes, was first squarely presented to the court in *Munn* v. *Illinois*, 94 U. S. 113, in which a power was conceded to the State to prescribe regulations and fix the charges of elevators used for the reception, storage, and delivery of grain, notwithstanding such elevators were used for the storage of grain destined for other States. The decision was put upon the ground that elevators were property "affected with a public interest," and that from time immemorial in England, and in this country from its first colonization, it had been customary to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, etc., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold. That the decision does not necessarily imply a power in the States to prescribe similar regulations with regard to railroads and other corporations directly engaged in interstate commerce is evident from the remarks of the Chief Justice, p. 135, in delivering the opinion of the court: "The warehouses of these plaintiffs in error are situated and their business carried on exclusively within the limits of the State of Illinois. They are used as instruments by those engaged in state as well as those engaged in interstate commerce, but they are no more necessarily a part of commerce itself than the dray or the cart by which, but for them, grain would be transferred from one railroad station to another. Incidentally they may become connected with interstate commerce, but not necessarily so. Their regulation is a thing of domestic concern, and certainly, until Congress acts in reference to their interstate relations, the State may exercise all the powers of government over

them, even though in so doing it may operate upon commerce outside its immediate jurisdiction." The principle of this case has been recently affirmed in *Budd* v. *New York*, 143 U. S. 517, and reaffirmed in *Brass* v. *North Dakota*, 153 U. S. 391, though not without strong opposition from a minority of the court.

In the next case, viz., that of the *Chicago, Burlington &c. Railroad* v. *Iowa*, 94 U. S. 155, 163, a bill was filed by the Chicago, Burlington and Quincy Railroad Company, an Illinois corporation, to restrain the prosecution of suits against it under "An act to establish reasonable maximum rates of charges for the transportation of freight and passengers on the different railroads of this State." The complainant was also the lessee of the Burlington and Missouri Railroad in Iowa, the two roads being connected by a bridge which crossed the Mississippi River at Burlington, thus making a continuous railroad from Chicago to Platsmouth on the Missouri River, in Iowa. The case was held to be covered by *Munn* v. *Illinois*, the road, like the warehouse in that case, being situated within the limits of a single State. "Its business," said the Chief Justice, "is carried on there, and its regulation is a matter of domestic concern. It is employed in state as well as interstate commerce, and, until Congress acts, the State must be permitted to adopt such rules and regulations as may be necessary for the promotion of the general welfare of the people within its own jurisdiction, even though in so doing, those without may be indirectly affected." In short, the case was treated as one of internal commerce only.

In the next case, viz., *Peik* v. *Chicago & Northwestern Railway*, 94 U. S. 164, it was held that, under the constitution of Wisconsin providing that all acts creating corporations within the State "may be altered or repealed by the legislature at any time after their passage," the legislature had a right to prescribe a maximum of charges to be made by the Chicago and Northwestern Railway Company for transporting persons or property within the State, or taken up outside the State and brought within it, or taken up inside

and carried without. The vital question is not discussed at any length, but it was held that, until Congress acted with reference to the relations of this company to interstate commerce, it was within the power of the State of Wisconsin to regulate its affairs so far as they were of a domestic concern. These three cases were cited with approval in *Ruggles* v. *Illinois*, 108 U. S. 526, in which the power of a State to limit the amount of charges by a railroad company for fares and freight was recognized.

A similar principle, though under quite a different state of facts, was involved in *Hall* v. *De Cuir*, 95 U. S. 485, which concerned an act of the legislature of Louisiana, requiring those engaged in the transportation of passengers among the States to give all persons travelling within that State, upon vessels employed in such business, equal rights and privileges in parts of the vessel, without distinction on account of race or color. The act was held to be a regulation of interstate commerce, and, therefore, unconstitutional and void. In the *Railroad Commission Cases*, 116 U. S. 307, it was held that the right of a State to limit the charges of a railroad company for the transportation of persons or property within its jurisdiction could not be granted away by its legislature unless by words of positive grant or words equivalent in law; and that a statute which granted to a railroad company the right from time to time to fix and regulate the tolls and charges by them to be received for transportation did not deprive the State of its power to act upon the reasonableness of the tolls and charges so fixed and regulated. It was held that the State might, " beyond all question, by the settled rule of decision in this court, regulate freights and fares for business done exclusively within the State, and it would seem to be a matter of domestic concern to prevent the company from discriminating against persons and places in Mississippi." " Nothing can be done by the government of Mississippi which will operate as a burden on the interstate business of the company or impair the usefulness of its facilities for interstate traffic. . . . The commission is in express terms prohibited by the act of March 15, 1884, from interfering

with the charges of the company for the transportation of persons or property through Mississippi from one State to another. The statute makes no mention of property taken up without the State and delivered within, nor of such as may be taken within and carried without." The court studiously avoided committing itself upon the question of the power of the commission over interstate commerce.

The prior cases were all reviewed, and the subject exhaustively considered in the *Wabash &c. Railway* v. *Illinois*, 118 U. S. 557, in which there came under review a statute of Illinois enacting that if any railroad company should, within that State, charge or receive for transporting passengers or freight of the same class the same or a greater sum for any distance than it does for a longer distance, it should be liable to a penalty for unjust discrimination. The defendant in that case made such discrimination in regard to goods transported over the same road or roads, from Peoria, Illinois, and from Gilman, in Illinois, to New York; charging more for the same class of goods carried from Gilman than from Peoria, the former being eighty-six miles nearer the city of New York than the latter, this difference being in the length of line in the State of Illinois. The court held that such transportation was commerce among the States, even as to that part of the voyage which lay within the State of Illinois, and that the regulation of such commerce was confided to Congress exclusively, under its power to regulate commerce between the States, and that the statute in question, being intended to regulate the transmission of persons or property from one State to another, was not within that class of legislation which the States may enact in the absence of legislation by Congress. In delivering the opinion of the court Mr. Justice Miller cited the prior cases, and said that it must be admitted that, in a general way, the court treated the cases then before it as belonging to that class of regulations of commerce, which, like pilotage, bridging navigable rivers, and many others, could be acted upon by the States in the absence of any legislation by Congress upon the same subject. He further observed that " the great question to be decided, and

which was decided, and which was argued in all those cases, was the right of the State in which the railroad company did business to regulate or limit the amount of any of these traffic charges. The importance of that question overshadowed all others; and the case of *Munn* v. *Illinois* was selected by the court as the most appropriate one in which to give its opinion on that subject, because that case presented the question of a private citizen, or unincorporated partnership, engaged in the warehouse business in Chicago, . . . free from the question of continuous transportation through the several States, . . . and the question how far a charge made for a continuous transportation over several States, which included a State whose laws were in question, may be divided into separate charges for each State, in enforcing the power of the States to regulate the fares of its railroads, was evidently not fully considered." The substance of the opinion was that, if the prior cases were to be considered as laying down the principle that the States might regulate the charges for interstate traffic, they must be considered as overruled. See also *Bowman* v. *Chicago &c. Railway*, 125 U. S. 465. In none of the subsequent cases has any disposition been shown to limit or qualify the doctrine laid down in the *Wabash case*, and to that doctrine we still adhere.

The real question involved here is whether this case can be distinguished from the *Wabash case*. That involved the right of a single State to fix the charge for transportation from the interior of such State to places in other States. This case involves the right of one State to fix charges for the transportation of persons and property over a bridge connecting it with another State, without the assent of Congress or such other State, and thus involving the further inquiries, first, whether such traffic across the river is interstate commerce; and, second, whether a bridge can be considered an instrument of such commerce.

The *first* question must be answered in the affirmative upon the authority of *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, in which the State of Pennsylvania attempted to tax the capital stock of a corporation whose entire business

consisted in ferrying passengers and freight over the river Delaware between Philadelphia, in Pennsylvania, and Gloucester, in New Jersey. This traffic was held to be interstate commerce, and, inasmuch as it appeared that the ferry boats were registered in New Jersey and were taxable there, it was held that there was no property held by the company which could be the subject of taxation in Pennsylvania, except the lease of a wharf in that State. " Congress alone," said the court, (page 204,) " therefore, can deal with such transportation ; its non-action is a declaration that it shall remain free from burdens imposed by state legislation. Otherwise, there would be no protection against conflicting regulations of different States, each legislating in favor of its own citizens and products and against those of other States." If, as was intimated in that case, interstate commerce means simply commerce between the States, it must apply to all commerce which crosses the state line, regardless of the distance from which it comes or to which it is bound, before or after crossing such state line — in other words, if it be commerce to send goods from Cincinnati, in Ohio, to Lexington, in Kentucky, it is equally such to send goods or to travel in person from Cincinnati to Covington ; and while the reasons which influenced this court to hold in the *Wabash case* that Illinois could not fix rates between Peoria and New York may not impress the mind so strongly when applied to fixing the rates of toll upon a bridge or ferry, the principle is identically the same, and, at least in the absence of mutual or reciprocal legislation between the two States, it is impossible for either to fix a tariff of charges.

With reference to the *second* question, an attempt is made to distinguish a bridge from a ferry boat, and to argue that while the latter is an instrument of interstate commerce, the former is not. Both are, however, vehicles of such commerce, and the fact that one is movable and the other is a fixture makes no difference in the application of the rule. Commerce, was defined in *Gibbons* v. *Ogden*, 9 Wheat. 1, 189, to be "intercourse," and the thousands of people who daily pass and repass over this bridge may be as truly said to be engaged in

commerce as if they were shipping cargoes of merchandise from New York to Liverpool. While the bridge company is not itself a common carrier, it affords a highway for such carriage, and a toll upon such bridge is as much a tax upon commerce as a toll upon a turnpike is a tax upon the traffic of such turnpike, or the charges upon a ferry a tax upon the commerce across a river. A tax laid upon those who do the business of common carriers upon a certain bridge is as much a tax upon the commerce of that bridge as if the owner of the bridge were himself a common carrier.

Let us examine some of the cases which are supposed to countenance the doctrine that ferries and bridges connecting two States are not instruments of commerce between such States in such sense as to exempt them from state control. In *Conway* v. *Taylor's Executors*, 1 Black, 603, a ferry franchise on the Ohio was held to be grantable under the laws of Kentucky to a citizen of that State who was a riparian owner on the Kentucky side. It was said not to be necessary to the validity of the grant that the grantee should have the right of landing on the other side or beyond the jurisdiction of the State. The opinion, however, did not pass upon the question of the right of one State to regulate the charge for ferriage, nor does it follow that because a State may authorize a ferry or bridge from its own territory to that of another State, it may regulate the charges upon such bridge or ferry. A State may undoubtedly create corporations for the purpose of building and running steamships to foreign ports, but it would hardly be claimed that an attempt to fix a scale of charges. for the transportation of persons or property to and from such foreign ports would not be a regulation of commerce and beyond the constitutional power of the State. It is true the States have assumed the right in a number of instances, since the adoption of the Constitution, to fix the rates or tolls upon interstate ferries and bridges, and perhaps in some instances have been recognized as having the authority to do so by the courts of the several States. But we are not aware of any case in this court where such right has been recognized. Of recent years it has been the custom to obtain the consent of

Congress for the construction of bridges over navigable waters, and by the seventh section of the act of September 19, 1890, c. 907, 26 Stat. 426, 454, it is made unlawful to begin the construction of any bridge over navigable waters, until the location and plan of such bridge have been approved· by the Secretary of War, who has also been in frequent instances authorized to regulate the tolls upon such bridges, where they connected two States. So, too, in *Wiggins Ferry Company* v. *East St. Louis*, 107 U. S. 365, it was held that a State had the power to impose a license fee, either directly or through one of its municipal corporations, upon ferry-keepers living in the State, for boats which they owned and used in conveying from a landing in the State passengers and goods across a navigable river to another State. It was said that "the levying of a tax upon vessels or other water-craft, or the exaction of a license fee by the State within which the property subject to the exaction has its *situs*, is not a regulation of commerce within the meaning of the Constitution of the United States." Obviously the case does not touch the question here involved. Upon the other hand, however, it was held in *Moran* v. *New Orleans*, 112 U. S. 69, that a municipal ordinance of New Orleans imposing à license tax upon persons owning and running tow boats to and from the Gulf of Mexico was void as a regulation of commerce.

It is clear that the State of Kentucky, by the statute in question, attempts to reach out and secure for itself a right to prescribe a rate of toll applicable not only to persons crossing from Kentucky to Ohio, but from Ohio to Kentucky, a right which practically nullifies the corresponding right of Ohio to fix tolls from her own State. It is obvious that the bridge could not have been built without the consent of Ohio, since the north end of the bridge and its abutments rest upon Ohio soil; and without authority from that State to exercise the right of eminent domain, no land could have been acquired for that purpose. It follows that, if the State of Kentucky has the right to regulate the travel upon such bridge and fix the tolls, the State of Ohio has the same right, and so long as their action is harmonious there may be no room for friction

between the States; but it would scarcely be consonant with good sense to say that separate regulations and separate tariffs may be adopted by each State, (if the subject be one for state regulation,) and made applicable to that portion of the bridge within its own territory. So far as the matter of construction is concerned, each State may proceed separately by authorizing the company to condemn land within its own territory, but in the operation of the bridge their action must be joint or great confusion is likely to result. It may be for the interest of Kentucky to add to its own population by encouraging residents of Cincinnati to purchase homes in Covington, and to do this by fixing the tolls at such a rate as to induce citizens of Ohio to reside within her borders. It might be equally for the interest of Ohio to prescribe a higher rate of toll to induce her citizens to remain and fix their homes within their own State, and as persons living in one State and doing business in another would necessarily have to cross the bridge at least twice a day, the rates of toll might become a serious question to them. Congress, and Congress alone, possesses the requisite power to harmonize such differences, and to enact a uniform scale of charges which will be operative in both directions. The authority of the State, so frequently recognized by this court, to fix tolls for the use of wharves, piers, elevators, and improved channels of navigation, has always been limited to such as were exclusively within the territory of a single State, thus affecting interstate commerce but incidentally, and cannot be extended to structures connecting two States without involving a liability of controversies of a serious nature. For instance, suppose the agent of the Bridge Company in Cincinnati should refuse to recognize tickets sold upon the Kentucky side, enabling the person holding the ticket to pass from Ohio to Kentucky, it would be a mere *brutum fulmen* to attempt to punish such agent under the laws of Kentucky. Or, suppose the State of Ohio should authorize such agent to refuse a passage to persons coming from Kentucky who had not paid the toll required by the Ohio statute; or that Kentucky should enact that all persons crossing from Kentucky to Ohio should be entitled to a free

passage, and thus attempt to throw the whole burden upon persons crossing in the opposite direction. It might be an advantage to one State to make the charge for foot passengers very low and the charge for merchandise very high; and for the other side to adopt a converse system. One scale of charges might be advantageous to Kentucky in this instance, where the larger city is upon the north side of the river, while a wholly different system might be to her advantage at Louisville, where the larger city is upon the south side.

We do not wish to be understood as saying that, in the absence of Congressional legislation or mutual legislation of the two States, the company has the right to fix tolls at its own discretion. There is always an implied understanding with reference to these structures that the charges shall be reasonable, and the question of reasonableness must be settled as other questions of a judicial nature are settled, by the evidence in the particular case. As was said in *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, 217, "freedom from such impositions does not of course imply exemption from reasonable charges, as compensation for the carriage of persons, in the way of tolls or fares, or from the ordinary taxation to which other property is subjected, any more than like freedom of transportation on land implies such exemption. Reasonable charges for the use of property, either on water or land, are not an interference with the freedom of transportation between the States secured under the commercial power of Congress." Nor are we to be understood as passing upon the question whether, in the absence of legislation by Congress, the States may by reciprocal action fix upon a tariff which shall be operative upon both sides of the river.

We do hold, however, that the statute of the Commonwealth of Kentucky in question in this case is an attempted regulation of commerce which it is not within the power of the State to make. As was said by Mr. Justice Miller in the *Wabash case:* "It is impossible to see any distinction in its effects upon commerce of either class between a statute which regulates the charges for transportation and a statute which

levies a tax for the benefit of the State upon the same transportation."

*The judgment of the Court of Appeals of Kentucky is therefore reversed, and the case remanded to that court for further proceedings in conformity with this opinion.*

MR. CHIEF JUSTICE FULLER, MR. JUSTICE FIELD, MR. JUSTICE GRAY, and MR. JUSTICE WHITE concurred in the judgment of reversal, for the following reasons:

The several States have the power to establish and regulate ferries and bridges, and the rates of toll thereon, whether within one State, or between two adjoining States, subject to the paramount authority of Congress over interstate commerce.

By the concurrent acts of the legislature of Kentucky in 1846, and of the legislature of Ohio in 1849, this bridge company was made a corporation of each State, and authorized to fix rates of toll.

Congress, by the act of February 17, 1865, c. 39, declared this bridge " to be, when completed in accordance with the laws of the States of Ohio and Kentucky, a lawful structure;" but made no provision as to tolls; and thereby manifested the intention of Congress that the rates of toll should be as established by the two States. 13 Stat. 431.

The original acts of incorporation constituted a contract between the corporation and both States, which could not be altered by the one State without the consent of the other.