INTERNATIONAL TRANSIT CO. v. CITY OF SAULT STE. MARIE et al.

(District Court, W. D. Michigan, N. D.   March 14, 1912.)

1. LICENSES (§ 6*)—REGULATION—AUTHORITY OF CITIES—INTERNATIONAL NAVIGATION.

A city, by virtue of its charter powers derived from the state, has no right to exact a license fee from a citizen of a foreign country for the privilege of operating ferryboats, situs of which is in such foreign country, engaged in the ferriage of passengers and property from a private wharf across an international boundary river to a landing on the opposite shore.

[Ed. Note.—For other cases, see Licenses, Cent. Dig. §§ 5, 6; Dec. Dig. § 6.*

Ferries as carriers, see note to Wade v. Lutcher & Moore Cypress Lumber Co., 20 C. C. A. 536.]

2. TREATIES (§ 8*)—INTERNATIONAL NAVIGATION—REGULATION—FEES.

Under the treaty between the United States and Great Britain, Jan. 11, 1909, 36 Stat. 2449, art. 1, relating to the boundary waters between the United States and Canada, and providing that the navigation of navigable boundary waters shall be free and open for the purpose of commerce to the inhabitants and to the ships of both countries, equally, subject to any laws and regulations of either country, within its own territory, not inconsistent with such privilege of free navigation, and applying equally without discrimination to the inhabitants, ships, vessels, and boats of both countries, the city of Sault Ste. Marie had no power to prescribe and fix rates of fare to be charged by the Canadian owner and operator of ferryboats across St. Mary's river between Ontario and Michigan as a municipal regulation.

[Ed. Note.—For other cases, see Treaties, Cent. Dig. § 8; Dec. Dig. § 8.*]

In Equity.   Suit by the International Transit Company against the City of Sault Ste. Marie and others.   Decree for complainant.

The complainant is a corporation organized under the laws of the province of Ontario, Dominion of Canada, and licensed by the Dominion government to operate a ferry called "Kings Ferry" across St. Mary's river between Sault Ste. Marie, Ontario, and Sault Ste. Marie, Mich.   St. Mary's river is navigable for large boats and vessels and is a part of the boundary waters between the United States and Canada.   Complainant owns and operates two steam vessels of Canadian register in its business of ferrying passengers and property across St. Mary's river between the two cities.   It owns and uses a pri-

vate wharf in the city of Sault Ste. Marie, Ontario, and leases and uses a private wharf or dock in the city of Sault Ste. Marie, Mich., and does not make use of any dock, wharf, or property of any kind belonging to the city. It maintains and has an office and warehouse upon the leased dock where all fares and tolls are paid and received; none being paid or collected upon the boats. Complainant's license from the Dominion government specifies the seasons during which the ferry shall be operated, the frequency of service to be given, and the hours at which boats shall be run, fixes a schedule of rates to be charged for the several classes of transportation, passengers, vehicles, and freight, prohibits the taking or receiving of any other or larger fares or tolls than those so imposed, and declares that by any failure to comply with its terms the right to operate the ferry shall be forfeited.

The defendant city of Sault Ste. Marie is a municipal corporation organized under the laws of the state of Michigan, and, by its charter granted by the state Legislature, has the right, power, and authority "to establish or authorize, license and regulate, ferries to and from the city or any place therein, or from one part of the city to another, and to regulate and prescribe, from time to time, the charges and prices for the transportation of persons and property thereon."

Section 191 of the legislative act constituting the city charter also provides as follows: "The council may regulate and license ferries from the city or any place or landing therein to the opposite shore, or from one part of the city to another, and may require the payment of such reasonable sum for such license as the council shall deem proper; and may impose such reasonable terms and restrictions in relation to the keeping and management of such ferries, and the time, manner and rates of carriage and transportation of persons and property as may be proper; and provide for the revocation of any such license, and for the punishment, by proper fines and penalties, of the violation of any ordinance prohibiting unlicensed ferries and regulating those established and licensed."

Pursuant to the authority thus conferred, the council of the defendant city has adopted an ordinance entitled "An ordinance to license and regulate ferries." Sections 1, 2, and 3 of such ordinance are as follows:

"Section 1. No person, persons, or company shall operate a ferryboat, or engage in the business of carrying or transporting persons or property thereon from the city of Sault Ste. Marie, Michigan, and across the St. Mary's river to the opposite shore, without first obtaining a license therefor from the mayor and by otherwise complying with the provisions of this ordinance.

"Sec. 2. The mayor of said city is hereby empowered and authorized to issue and grant a license, as herein provided, to any person, persons, or company to keep, maintain and operate a ferry or ferries, for the carrying and transporting of persons and property from the city of Sault Ste. Marie, Michigan, across the St. Mary's river to the opposite shore, on his, or their paying into the city treasury the sum of fifty ($50) dollars annually for each boat so engaged in the carrying and transportation of persons and property, and for each launch, sailboat or rowboat used and operated as a ferry from said city to the opposite shore, the sum of five ($5) dollars annually.

"Sec. 3. Before any license shall be issued or granted by the mayor as provided in section two (2) of this ordinance, the person, persons or company desiring the same, shall make application therefor to the mayor in writing, which application shall state the name or names of the boat or boats to be operated as a ferry or ferries, the place or places for receiving and landing persons and property by said ferry or ferries within said city, and which application shall also be signed by the person or persons desiring the license; and when said application is made by a company or corporation, said application shall be signed by the duly authorized officers of such company or corporation. Said application shall also contain a true and correct schedule of the rates of ferriage of persons and property proposed to be charged by the applicant within the territory prescribed by section two (2) of this ordinance. And no license shall be issued or granted hereunder unless the application therefor shall conform to the provisions of this ordinance. And any licensee, to whom a license shall have been issued under this ordinance, who shall fail or refuse to conduct his or their business of ferrying under said license in

accordance with the terms, provisions and conditions contained in the application therefor, or contrary to the provisions of this ordinance, shall be deemed to have forfeited his or their rights to operate said ferry or ferries, and shall subject the offender to the same penalties herein provided for po- erating a ferry or ferries contrary to this ordinance without a license therefor."

Other sections of the ordinance specify, as minutely as the Canadian li- cense, the season, frequency, and hours of service and rates to be charged for the several classes of transportation. In all these particulars the rules spec- ified by the ordinance are different from those prescribed by the Canadian license. The ordinance also provides that, for failure to comply with any of its terms, the right to operate the ferry shall be forfeited and the company and its employés shall be subject to criminal prosecution.

Article 1 of the treaty between the United States and Great Britain of Jan. 11, 1909, 36 Stat. 2449, relating to boundary waters between the United States and Canada, contains this provision: "The high contracting parties agree that the navigation of all navigable boundary waters shall forever con- tinue free and open for the purposes of commerce to the inhabitants and to the ships, vessels, and boats of both countries equally, subject, however, to any laws and regulations of either country, within its own territory, not incon- sistent with such privilege of free navigation and applying equally and with- out discrimination to the inhabitants, ships, vessels, and boats of both countries."

The defendants seek to enforce the ordinance above mentioned by prose- cution of the complainant's employés for failure to comply with it and com- plainant brings this suit to restrain such enforcement.

Boynton, McMillan, Bodman & Turner, of Detroit, Mich., for com- plainant.

F. T. McDonald (John W. Shine, of counsel), of Sault Ste. Marie, Mich., for defendants.

SESSIONS, District Judge (after stating the facts as above). Com- plainant contends that, in operating its ferry and ferryboats, it is en- gaged in foreign commerce, and that the enforcement of the city ordi- nance in question is a violation of the commerce clause of the Con- stitution of the United States, which places the regulation of interstate and foreign commerce within the exclusive jurisdiction and control of Congress, and is also a violation of the above-quoted article of the treaty between the United States and Great Britain. On the other hand, the defendants contend that the right to license and regulate fer- ries, even though they are operated upon and across boundary waters between states or between the United States and a foreign country, is one of the many powers reserved to the states and not delegated to Congress, and therefore that the enforcement of this ordinance is a lawful exercise of such power and is not an encroachment upon the constitutional powers of Congress, nor a violation of rights secured by treaty, even though foreign commerce may thereby be incidentally affected.

In support of their respective contentions, counsel upon both sides rely upon decisions of the Supreme Court of the United States. Coun- sel for complainant insist that the later decisions of that court, par- ticularly in the cases of Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158, and Covington Bridge Co. v. Kentucky, 154 U. S. 204, 14 Sup. Ct. 1087, 38 L. Ed. 962, have set-

tled the present issues in its favor, while counsel for defendants are equally insistent that the later decisions have in no wise modified or overruled the earlier ones (Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Fanning v. Gregoire, 16 How. 524, 14 L. Ed. 1043; Conway v. Taylor, 1 Black, 603, 17 L. Ed. 191, and Wiggins Ferry Co. v. East St. Louis, 107 U. S. 365, 2 Sup. Ct. 257, 27 L. Ed. 419), by which they claim the questions here involved have been foreclosed in accordance with their contentions.

The difficult and delicate problem thus presented is precisely stated but not solved in St. Clair County v. Interstate Transfer Company, 192 U. S. 454–465, 24 Sup. Ct. 300, 303 (48 L. Ed. 518), where the court, after reviewing the cases above mentioned, says:

"The position of the parties as to the cases which we have reviewed is this: The county (city) insists that the statement in Gibbons v. Ogden that the establishment of ferries was within the reserved powers of the states, and the rulings in Fanning v. Gregoire, Conway v. Taylor, and Wiggins Ferry Co. v. East St. Louis, affirmatively settle that a state may establish ferries over a navigable river, the boundary between two states, and license the same, and that doing so is not only not repugnant to the commerce clause of the Constitution of the United States, but is in consonance therewith, since the power as to ferries was reserved to the states and not delegated to the national government. The Gloucester Ferry Case, it is said, rested upon the nature of the particular tax imposed by the state of Pennsylvania, and that the case may hence not be considered as overruling the previous cases, not only because it did not expressly refer to them, but also because some expressions found in the opinion which we have cited are construed as substantially affirming the right of the state to regulate and license a ferry like the one here in question. On the other hand, the corporation urges that the rulings in Fanning v. Gregoire and Conway v. Taylor proceeded upon a misconception and partial view of the language of Chief Justice Marshall in Gibbons v. Ogden. That language, it is insisted, when the sentences are considered which immediately precede the passage quoted in Fanning v. Gregoire and Conway v. Taylor, clearly demonstrates that the Chief Justice was referring to the power of the states to license and control ferries on streams of a local character, and this, it is said, is demonstrated by the statement on the subject in the Gloucester Ferry Case. The case of Wiggins Ferry Co. v. East St. Louis, it is argued, proceeded, not upon the right of the state over the ferry, but upon its power to tax property whose situs was within its jurisdiction, and this was the view adopted by the court below. The Gloucester Ferry Case, it is urged, did not proceed upon the nature of the tax, but upon the want of power in the state of Pennsylvania to exert its control over a ferry crossing a river which was a boundary between two states, so as in effect to burden the carrying on of interstate commerce. And that case, it is further insisted, therefore qualifies, if it does not specifically overrule, the earlier cases."

The rulings in Gloucester Ferry Co. v. Pennsylvania and Covington Bridge Co. v. Kentucky, when applied to the conceded facts of the present case, settle beyond controversy that the complainant is engaged exclusively in foreign commerce, and that its ferryboats, wharfs, docks, offices, and warehouses are all instruments of foreign commerce. But defendants insist that the power to regulate ferries, even though they are engaged in and are instruments of interstate or foreign commerce, is vested and rests in the state and its municipal corporations, and that such power to regulate includes the right to license and to require the payment of a license fee and also the right to prescribe rates and tolls for the transportation thereon of persons and

property. Section 1 of the city ordinance under consideration provides that:

"No person, persons, or company shall operate a ferryboat, or engage in the business of carrying or transporting persons or property thereon" from the Michigan city across the river to the Canadian shore "without first obtaining a license therefor from the mayor and by otherwise complying with the provisions of this ordinance."

Section 2 empowers and authorizes the mayor of the city to issue and grant a license "as herein provided" upon the payment of the prescribed annual license fee. Section 3 provides that:

"Before any license shall be issued or granted by the mayor as provided in section 2 of this ordinance, the person, persons or company desiring the same, shall make application therefor to the mayor in writing * * * signed by the person or persons desiring the license. * * * Said application shall also contain a true and correct schedule of the rates of ferriage of persons and property proposed to be charged by the applicant. * * * And no license shall be issued, or granted hereunder unless the application therefor shall conform with the provisions of this ordinance."

Section 6 prescribes in detail the tolls and fares to be charged for the ferriage of persons and property. It thus appears that the payment of a license fee and an agreement to comply with the terms of the ordinance as to tolls and fares are both conditions precedent to the obtaining of a license and to the right to engage in a business which is foreign or international commerce. It necessarily follows that unless the state, through its municipal agency, has the right both to exact a license fee for the privilege of engaging in international commerce and to prescribe the rates to be charged therein, this ordinance cannot be sustained. Two questions are thus presented:

First. Has a state municipality the right and power to license a ferry operated by a foreign corporation upon and across navigable international boundary waters?

Second. As a municipal regulation, can the state municipality prescribe and fix the rates of fare to be charged by the owner for the transportation of persons and property upon such ferry?

[1] The first question has not been definitely answered in the adjudicated cases in the federal courts. The doctrine that the power to license ferries and to impose a license fee upon ferry keepers engaged in interstate commerce is a police power which can be exercised by the state and its municipal corporations "undoubtedly finds support in the opinions announced in Fanning v. Gregoire and Conway v. Taylor." In Wiggins Ferry Co. v. East St. Louis, the court expressly declared that a state has the power "to impose a license fee either directly or through one of its municipal corporations upon the keepers of ferries living in the state for boats owned by them and used in ferrying passengers and goods from a landing in the state across a navigable river to a landing in another state." The following excerpts from the opinion in that case clearly and concisely state the rule there laid down and also its limitations:

"The levying of a tax upon vessels or other water craft or the exaction of a license fee by the state within which the property subject to the exaction has its situs is not a regulation of commerce within the meaning of the Constitution of the United States. * * * The exaction of a license fee is

an ordinary exercise of the police power by municipal corporations. When, therefore, a state expressly grants to an incorporated city, as in this case, the power 'to license, tax, and regulate ferries,' the latter may impose a license tax on the keepers of ferries, although their boats ply between landings lying in two different states, and the act by which this exaction is authorized will not be held to be a regulation of commerce."

The basic principle underlying this decision of the Supreme Court seems to be that a municipality has the power to tax property located within its limits or to exact a license fee from the owners thereof living within its limits for the privilege of using and employing such property in a quasi public service, and that the exercise of such power, when applied to persons engaged in and to instruments employed in interstate commerce, is not an invasion of the exclusive power of Congress to regulate commerce conferred upon it by the Constitution. Thus construed and limited, the Wiggins Ferry Case falls far short of sustaining defendants' contention that the city of Sault Ste. Marie, by virtue of its charter powers derived from the state, has the right to exact a license fee from a citizen of a foreign country for the privilege of operating ferryboats, whose situs is in such foreign country, in the ferriage of passengers and property from a private wharf in the defendant city across an international boundary river to a landing upon the opposite shore. By inference at least, the right to exact such license fee is negatived in the following cases, where the Wiggins Ferry Case is cited and construed: Moran v. New Orleans, 112 U. S. 69–74, 5 Sup. Ct. 38, 28 L. Ed. 653; Pickard v. Pullman Southern Car Co., 117 U. S. 34–50, 6 Sup. Ct. 635, 29 L. Ed. 785; Pullman's Car Co. v. Pennsylvania, 141 U. S. 18–23, 11 Sup. Ct. 876, 35 L. Ed. 613.

[2] The second question must be answered in the negative upon the authority of Covington Bridge Co. v. Kentucky, 154 U. S. 204, 14 Sup. Ct. 1087, 38 L. Ed. 962, in which it was held that the state of Kentucky had no power to fix or regulate tolls upon a bridge over a navigable stream between the states of Ohio and Kentucky. The positive language of the Supreme Court in that case, when applied to the facts in the present case, settles beyond controversy that the city of Sault Ste. Marie has no power to fix rates and charges for the transportation of persons and property upon an international ferry:

"If, as was intimated in that case (Gloucester Ferry Company v. Pennsylvania), interstate commerce means simply commerce between the states, it must apply to all commerce which crosses the state line, regardless of the distance from which it comes or to which it is bound, before or after crossing such state line; in other words, if it be commerce to send goods from Cincinnati, in Ohio, to Lexington, in Kentucky, it is equally such to send goods or to travel in person from Cincinnati to Covington. And while the reasons which influenced this court to hold, in the Wabash Case [118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244], that Illinois could not fix rates between Peoria and New York, may not impress the mind so strongly when applied to fixing the rates of toll upon a bridge or ferry, the principle is identically the same, and, at least in the absence of mutual or reciprocal legislation between the two states, it is impossible for either to fix a tariff of charges.

"With reference to the second question, an attempt is made to distinguish a bridge from a ferryboat, and to argue that while the latter is an instrument of interstate commerce, the former is not. Both are, however, vehicles of such commerce, and the fact that one is movable and the other is a fixture

makes no difference in the application of the rule. * * * While the bridge company is not itself a common carrier, it affords a highway for such carriage, and a toll upon such bridge is as much a tax upon commerce as a toll upon a turnpike is a tax upon the traffic of such turnpike, or the charges upon a ferry a tax upon the commerce across a river.

"In Conway v. Taylor's Executors, 1 Black, 603 [17 L. Ed. 191], a ferry franchise on the Ohio was held to be grantable under the laws of Kentucky to a citizen of that state who was a riparian owner on the Kentucky side. It was said not to be necessary to the validity of the grant that the grantee should have the right of landing on the other side or beyond the jurisdiction of the state. The opinion, however, did not pass upon the question of the right of one state to regulate the charge for ferriage, nor does it follow that because a state may authorize a ferry or bridge from its own territory to that of another state, it may regulate the charges upon such bridge or ferry. A state may undoubtedly create corporations for the purpose of building and running steamships to foreign ports, but it would hardly be claimed that an attempt to fix a scale of charges for the transportation of persons or property to and from such foreign ports would not be a regulation of commerce and beyond the constitutional power of the state. * * *

"We do hold, however, that the statute of the commonwealth of Kentucky in question in this case is an attempted regulation of commerce which it is not within the power of the state to make. As was said by Mr. Justice Miller in the Wabash Case: 'It is impossible to see any distinction in its effects upon commerce of either class between a statute which regulates the charges for transportation and a statute which levies a tax for the benefit of the state upon the same transportation.'"

It is undoubtedly true that the courts of several of the states, in deliverances both before and since the decision above quoted, have held that the states possess the rights and powers claimed for them by the defendants in the case at bar. It is also true that this doctrine finds slight support in certain dicta contained in some of the earlier opinions of the Supreme Court when read and considered apart from their context and when separated from the facts to which they relate. Further comment upon these decisions of the state court and these expressions of the federal court is made unnecessary, if not improper, by the following pertinent statement in the opinion in the Covington Bridge Case:

"It is true the states have assumed the right in a number of instances, since the adoption of the Constitution, to fix the rates or tolls upon interstate ferries and bridges, and perhaps in some instances have been recognized as having the authority to do so by the courts of the several states. But we are not aware of any case in this court where such right has been recognized."

Neither the state of Michigan nor its municipal corporation, the city of Sault Ste. Marie, has any power or authority to negotiate or treat with the Dominion of Canada with relation to the regulation of commerce between the two countries or the instruments of such commerce. As was said in the case of Bowman v. Chicago & Northwestern Ry. Co., 125 U. S. 465–482, 8 Sup. Ct. 689, 697 (31 L. Ed. 700):

"Laws which concern the exterior relations of the United States with other nations and governments are general in their nature, and should proceed exclusively from the legislative authority of the nation. The organization of our state and federal system of government is such that the people of the several states can have no relations with foreign powers in respect to commerce or any other subject, except through the government of the United States and its laws and treaties. Henderson v. Mayor of New York, 92 U. S. 259, 273 [23 L. Ed. 543]."

And again, in Crutcher v. Kentucky, 141 U. S. 47–57–58, 11 Sup. Ct. 851, 854 (35 L. Ed. 649):

"It has frequently been laid down by this court that the power of Congress over interstate commerce is as absolute as it is over foreign commerce. Would any one pretend that a state Legislature could prohibit a foreign corporation—an English or a French transportation company, for example—from coming into its borders and landing goods and passengers at its wharves, and soliciting goods and passengers for a return voyage, without first obtaining a license from some state officer, and filing a sworn statement as to the amount of its capital stock paid in? And why not? Evidently because the matter is not within the province of state legislation, but within that of national legislation. Inman Steamship Co. v. Tinker, 94 U. S. 238 [24 L. Ed. 118]. The prerogative, the responsibility, and the duty of providing for the security of the citizens and the people of the United States in relation to foreign corporate bodies, or foreign individuals with whom they may have relations of foreign commerce, belong to the government of the United States, and not to the government of the several states; and confidence in that regard may be reposed in the national Legislature without any anxiety or apprehension arising from the fact that the subject-matter is not within the province or jurisdiction of the state Legislatures."

In this particular instance the regulating acts of the local and subordinate municipalities of the two nations, whether authorized or unauthorized on the part of either, are conflicting and not mutual and reciprocal. The national governments have acted directly and, in the exercise of their treaty-making power, have ordained that the navigation of the waters of St. Mary's river "from main shore to main shore" shall forever continue free and open for the purpose of commerce to the inhabitants and to the ships, vessels, and boats of both countries equally, subject only to such local laws and regulations as are not inconsistent with such privilege of free navigation. In these respects the present case differs from those cases involving the regulation of bridges or ferries used in interstate commerce, and the intimation contained in the opinons in some of the cases that states by mutual or reciprocal legislation may possibly regulate and fix rates and tolls upon an interstate bridge or ferry has no application and need not be considered or discussed.

Complainant is entitled to the injunction prayed for in its bill of complaint, and a decree will be made accordingly. Complainant will recover its costs to be taxed against the defendant city of Sault Ste. Marie.