**GOUAX et al. v. BOVAY et al.**
No. 9108.

Circuit Court of Appeals, Fifth Circuit.
July 6, 1939.

Leavenworth Colby, Atty., Dept. of Justice, of Washington, D. C., and Toxey Hall, U. S. Atty., and A. Y. Harper, Asst. U. S. Atty., both of Jackson, Miss., for appellants.

Allan Sholars, Geo. Gunby, and Fred G. Hudson, Jr., all of Monroe, La., and Wm. H. Watkins, of Jackson, Miss., for appellees.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

Vicksburg Bridge & Terminal Company on November 21, 1934, sought reorganization under 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The trustees in bankruptcy continued to operate the bridge on the schedule of tolls which had been previously used. The bridge crosses the Mississippi River from a point near Vicksburg, Mississippi, to a point in Louisiana and over it passes the Dixie-Overland Highway, a modern government-aid highway extending from Savannah, Georgia, to San Diego, California, on which no tolls are charged. The appellants, officers in the United States Army, during 1936 and 1937 paid bridge tolls for the movement of troops and motor vehicles of the United States across the bridge, but were disallowed credit for the expenditures by the Comptroller General, who held that under Section 2 of the Bridge Act of March 23, 1906, 33 U.S.C.A. § 492, no tolls were payable, since the highways leading to the bridge were free. The officers made a claim for refund in the bankruptcy court against the trustees in bankruptcy, who resisted on the ground that the Bridge Act, Sect. 4, 33 U.S.C.A. § 494, and its own private Act, Act May 3, 1926, Sect. 3, 44 St. 388, 389, expressly authorized the charge of tolls, subject to change by the Secretary of War, and he had never changed them. The District Judge, following the decision in United States v. Columbia River-Longview Bridge Co., 9 Cir., 99 F.2d 287, upheld the toll charges and disallowed the claims. The officers appeal, being represented here by the United States District Attorney and an Assistant Attorney General.

A bridge connecting one State with another is an instrumentality of interstate commerce, and the use of it and the charges or tolls demanded Congress may regulate. Covington & Cincinnati Bridge Co. v. Kentucky, 154 U.S. 204, 14 S.Ct. 1087, 38 L.Ed. 962. A bridge which crosses a navigable water, although wholly within a single State, may be an obstruction to navigation, and its construction and use may for this reason be regulated by Congress, though interstate commerce be not involved. Accordingly for many years the building of a bridge across any navigable waters of the United States has been forbidden unless the plans are approved by the Secretary of War and the Chief of Engineers, and if the water does not lie wholly in a State the consent of Congress is required. 33 U.S.C.A. § 401, § 491. We assume the consent of Congress may be conditioned as that body sees fit; but where Congress grants no land and gives no other special aid to the enterprise it is not to be supposed that a free use by the United States of the privately owned structure has been demanded. The Fifth Amendment, U.S.C.A.Const., prohibits the taking of private property for public use without just compensation. In common justice the Congress in merely exercising its power of regulation of commerce and navigation for the general good would not exact free use of an expensive structure to which it contributed nothing—not even the corporate franchise. When Alabama was admitted as a State certain navigable rivers were declared toll-free for the property of the United States, but it was held that the general control of the banks and beds of the streams was in the State, as they are in every State. Pollard v. Hagan, 3 How. 212, 11 L.Ed. 565. Where the United States have aided the construction of bridges or railroads, reduced charges or complete immunity from tolls for the passage of troops and public property have often been by clear language stipulated for. Where no such aid has been given such a stipulation is not to be expected and

ought to appear by language free from doubt. The principle that grants by the public are to be construed favorably to the public and doubts are to be resolved in favor of the public (Charles River Bridge v. Warren Bridge, 11 Pet. 420, 556, 9 L.Ed. 773; Perrin v. Chesapeake & Delaware Canal Co., 9 How. 172, 192, 13 L.Ed. 92) ought not to apply here, because the United States are not really making a grant, but when freedom from tolls is claimed are attempting to take the use of private property without a compensation adjusted to the use.

■ The Congress by the Act of May 3, 1926, 44 St. 388, consented to the building and operation of this bridge "in accordance with the provisions of the Act entitled 'An Act to regulate the construction of bridges over navigable waters,' approved March 23, 1906, and subject to the conditions and limitations contained in this Act." Section 1. This special Act in Section 3 expressly authorizes the Company to "fix and charge tolls for transit over such bridge, and the rates so fixed shall be the legal rates until changed * * * under the authority contained in such Act of March 23, 1906." A toll bridge therefore was contemplated, and no special exemption was stipulated in behalf of the United States. If any exists it arises from the terms of the Act of March 23, 1906, 33 U.S.C.A. § 491 et seq., which apply to all bridges over any navigable waters, even those wholly within a State to which a special Congressional consent is unnecessary. The title to this Act, as just quoted, is "An Act To regulate the construction of bridges over navigable waters." Its first Section requires detailed plans and specifications to be submitted to the Secretary of War and the Chief of Engineers for approval and prohibits unapproved deviation from them. Section 2 under which toll restriction or immunity is claimed, declares the bridge a lawful structure,[1] and declares it a post route,[2] "upon which no higher charge shall be made for the transmission over the same of the mails, the troops, and the munitions of war of the United States than the rate per

mile paid for the transportation over any railroad, street railway, or public highway leading to said bridge;" "and the United States shall have the right to construct, maintain, and repair, without any charge therefor, telegraph and telephone lines across and upon said bridge and its approaches; and equal privileges in the use of said bridge and its approaches shall be granted to all telegraph and telephone companies."[3] Section 3 gives railroad companies equal rights to cross bridges built as railroad bridges on paying a reasonable compensation, in case of disagreement to be fixed by the Secretary of War. Section 4, after providing for draws, and rectification of obstructions to navigation, provides that "tolls * * * for the transit * * * of engines, cars, street cars, wagons, carriages * * * foot passengers, or other passengers, * * * shall be reasonable and just," and gives the Secretary of War power at any time to prescribe them.

■ Section 4 fully covers the matter of toll charges, which are accurately described as for the "transit" of engines, vehicles and passengers. Section 3 relates to the charges the bridge may make for its use by railroads. Section 2 we are persuaded is not directed at all to charges made by the bridge company for "transit," but to charges made by carriers against the United States for the "transmission" of the mail or "transportation" of troops and munitions across the bridge. The bridge company does not *transmit* or *transport* these, but merely permits the *transit* of them. These carriers are by Section 2 forbidden to charge the government a higher rate per mile for carrying across the bridge than they charge for carrying on railroad, street railroad or public highway, as the case may be. The mails have usually been carried under contracts, whether on stage coaches, by star routes, by railroad, or more lately by street railways, motor busses and trucks, usually on a mileage basis. The mileage basis is fixed for railroads in R.S. § 3998. We suppose that troops and munitions too are transported on a mileage basis usually. Section 2 thus makes the bridge a part of

---

[1] Such a bridge was held an abatable nuisance in Pennsylvania v. Wheeling & Belmont Bridge Co., 13 How. 518, 14 L. Ed. 249.

[2] All navigable rivers have long been declared public highways, R.S. 2476, 43 U.S.C.A. § 931, and all waters, railroads, canals, and plank roads over which the

mail is carried are for the time established post-roads. R.S. § 3964, 39 U.S.C. A. § 481. Bridges are included in highways in the Act of Nov. 9, 1921, 23 U.S. C.A. § 2.

[3] Telegraph lines have long been entitled to build along the post-roads. R.S. § 5263, 47 U.S.C.A. § 1.

the railroad or highway in contracts for transportation. The tolls to be paid to the bridge company fall under Sections 3 and 4. Section 2 does not touch the case where the United States transport in government vehicles, troops and munitions. Their transit is subject to the tolls fixed by the bridge company or the Secretary of War.

This has been the understanding in the Army until the Comptroller-General took the other view. See Army Regulations 1908, Art. 74, par. 1134. When in 1905 the United States began carrying mail by its rural carriers the question of tolls arose. The Assistant Attorney General advising the Postoffice Department held that the usual tolls must be paid. III Official Opinions P. O. Dept., p. 732. We think the new construction put forward, that Sect. 2 regulates bridge charges whenever anyone carries the mail, troops, or munitions, and that no charges are to be made if approach is over a free highway, whether originally free or recently made so, is unreasonable, tends to the taking of the use of private property without just compensation, and rests upon language too doubtful to uphold it. The tolls were demandable and ought not to be paid back.

Judgment affirmed.