# WEST INDIA & PANAMA TELEGRAPH COMPANY ET AL.

## v.

# PUBLIC SERVICE COMMISSION OF PORTO RICO.

San Juan, Equity, No. 1009.

CABLE REGULATIONS.

Jurisdiction—Unconstitutional Law.

1. An unconstitutional law is no law, and in attempting to enforce it an official ceases to act officially and can be enjoined as an individual.

Interstate Commerce—Franchise.

2. Interchange of commodities and of thought is the basis of

West India & P. Teleg. Co. v. Public Service Commission.

modern national life.    The right to conduct such interchange is a franchise, subject to regulation by the public.

Interstate Commerce—Telegraph.

3. A telegraph occupies the same relation to commerce as a carrier of messages as a railroad does as a carrier of goods; both are instruments of commerce.    Commerce with foreign countries and commerce among the different states are the same in nature, grow out of the same constitutional grant, and are equally within the regulating power of Congress.

Interstate Commerce in Porto Rico—Railroads.

4. The provision in § 33 of the Jones Act that the legislative Assembly can enact laws relating to railroads does not limit the power of Porto Rico to that one subject.    The debates of Congress cannot be taken into account as showing the intent of that body in regard to an act.    The question is the final interpretation of the words used, not what Congress had in mind.

Porto Rico—Extent.

5. While the Jones Act provides that the Interstate Commerce Act shall not apply to Porto Rico, it does not affect the powers of the Interstate Commerce Commission as to matters otherwise within its scope outside of the 3-mile limit surrounding the island of Porto Rico.    By the terms of the Porto Rico Public Service Commission Act of 1917 the powers of the Public Service Commission are limited to Porto Rico as so defined.    Interstate telegraphic business is not within the regulations of a state.

Ocean—Cable—National Law.

6. The ocean is held in common by nations of the world, and an individual claiming property rights there must enforce them through his nation.    Local legislation does not apply.

Executive Council—Public Service Commission.

7. The grant of powers of regulation to the executive council of Porto Rico, and to the Public Service Commission, is confined to matters in Porto Rico, that is to say, to powers necessary for local purposes only.

Due Process of Law—Amendment.

8. An amendment of a bill in equity, obnoxious to the due process of law clause of the Constitution, does not eliminate the question of due process where other paragraphs not amended allege that the law cuts off almost half of the revenues of the plaintiff.

West India & P. Teleg. Co. v. Public Service Commission.

Interveners—Rates.
> 9. At common law a person injured by a common carrier can sue for an overcharge. Quære, how far the court can go into the question after amendment has eliminated the question of rates.

Opinion filed August 28, 1918.

---

## The Facts Stated in the Pleadings.

The amended bill of complaint was filed July 12, 1918, on behalf of two different corporations, that is, the West India & Panama Telegraph Company, Limited, an English corporation doing business in Porto Rico by consent of the Crown of Spain, and subsequently the United States, and the Compagnie Française des Cables Telegraphiques, a corporation organized under the laws of France. The former, hereinafter called the English company, is the successor of José de Caceres, who obtained a concession by decree of the Crown May 28, 1868, containing conditions, and the decree of the Crown of August 6, 1868, confirming his bid therefor. These papers related to the establishment of a submarine telegraph cable between the islands of Cuba and Porto Rico and from Cuba to Mexico, Panama, and South America, and, while they do not fix the tariff rates, they show that one consideration connected with the bids was the advantageousness of the tariff rates. There was, however, only one bid. This concession and these rights had been transferred to the English company, and the cable was in operation before the change of sovereignty to the United States in 1898, and these rights are protected by the Treaty of Paris as other property. The English company does not transmit messages direct to the United States from Porto Rico, but from

Porto Rico to Santiago de Cuba via Jamaica. From Santiago these messages are transmitted over the lines of the Cuban Submarine Telegraph Company to Havana, and from Havana to Key West over the lines of the International Ocean Telegraph Company. From Key West they pass over a land line of the Western Union Telegraph Company to New York and elsewhere. The rate for commercial messages is 50 cents per word, of which the English company receives less than one half, that is to say, $23\frac{3}{4}$ cents. Other kinds of messages are subject to like division as to charges, government rates being free to Santiago de Cuba, from which point the connecting lines make their own charges.

The French company, on the other hand, was already in the operation of a line of submarine cable from Santo Domingo to Martinique, passing along the northerly coast of Porto Rico. This company applied in 1910 for permission to land and construct and operate a cable from San Juan connecting with its West India cable. This was granted by the President of the United States, with certain privileges to the government in the case of war, the company to obtain a permit or franchise from the Executive Council of Porto Rico, covering the manner and method of constructing and operating the station at San Juan. One of the provisions of this presidential permit was

"That the rates to be charged . . . between Porto Rico and the city of New York in either direction shall not be in excess of the following: (a) Upon commercial messages 50 cents per word . . . (c) Official messages of the government of the United States, the government of Porto Rico, or any of the departments thereof, shall be transmitted free of charge.

West India & P. Teleg. Co. v. Public Service Commission.

"That the said company, . . . shall submit to regulations prescribed by the executive council of Porto Rico from time to time of the terms and conditions of its telegraph service between Porto Rico and the city of New York, including the rates to be charged for commercial, press or news, and official messages within the limit above set forth, in accordance with the provisions of the Organic Law of said Island, and also subject to reserve legislative power of the Congress of the United States."

Such franchise was obtained from the local executive council and approved by the governor June 19, 1913. It provides: (3) That within the limitations provided in the permit granted by the United States government . . . the charges of said grantee for the transmission of messages between Porto Rico and the United States shall be subject to regulation by the executive council according to law.

After further provisions by the executive council as to management and rates, the company is given the right at any time after ninety days' notice to the executive council, to discontinue its service and remove its property. No stock or bonds shall be issued by the grantee on account of the property to be acquired in San Juan hereunder, except in exchange for actual cash or property at a fair valuation. The property constructed hereunder may be taken by the people of Porto Rico at the fair value thereof at any time during the period this ordinance remains in force, on arbitration whose methods are fixed, and after the payment of the purchase price the property shall be disconnected from the grantee's cable system.

The rates of the French company are likewise 50 cents per word, divided with the United States & Hayti Cable Company,

to which is paid 15 cents thereof. It makes no charge on government messages between Porto Rico and New York.

The Jones Act of March 2, 1917, abolished the executive council and created a Public Service Commission whose duties are more particularly set out by an act of the legislature of Porto Rico of December 6, 1917. (2 Laws Porto Rico 1917, p. 432.) By that act there were included in its provisions "telegraph and telephone communications whether by wire, wireless, or by cable," but it was added "that such companies shall not be subject to the provisions of this act with respect to any business transacted or to any property owned by them outside of Porto Rico, nor shall the provisions of this act be so construed as to extend to any matter or thing with regard to which Congress has regulated to the exclusion of the power of Porto Rico." The act provides that the Commission has power and duty to fix and determine the charges exacted by public service companies, including cable companies, for any service rendered. Thereunder the Public Service Commission, on March 26, 1918, ordered that the rates of the two plaintiffs "are hereby reduced by 40 per cent effective on April 9, 1918, on all commercial messages and press dispatches between the United States and Porto Rico. It is further ordered that this reduction shall remain in force for a period of six months unless previously changed before the expiration of said time by the Public Service Commission," and plaintiffs should furnish within that time a complete financial statement of their business for the past five years.

The bill goes on to allege the invalidity of the order because conflicting with the Interstate Commerce Act, and that the Porto Rico act excludes business outside of Porto Rico, the amount of damage they will suffer, and prayer for relief.

West India & P. Teleg. Co. v. Public Service Commission.

After some preliminary proceedings the cause now comes on to be heard upon a motion of the defendant to dismiss the bill for want of jurisdiction, because the plaintiffs have not submitted themselves to the jurisdiction of the Interstate Commission or of the Public Service Commission, and because the Interstate Commerce Act has been repealed as to Porto Rico. The matter was submitted on April 9, 1918.

*Messrs. F. H. Dexter* and *Juan B. Huyke* for plaintiffs.

*Messrs. Howard L. Kern,* Attorney General, and *Ferdinand Tannenbaum,* Assistant Attorney General, for defendant.

HAMILTON, Judge, delivered the following opinion:

The bill in this cause was filed April 9, 1918, and seeks to enjoin the Public Service Commission of Porto Rico from regulating the charges on cables between Porto Rico and the United States, which that Commission had ordered reduced 40 per cent. The matter comes up at present upon a motion of the defendant, joined in by the Insular Chamber of Commerce, heretofore permitted to intervene, raising the question of jurisdiction of this court and also moving to dismiss the bill for reasons set out.

1. The jurisdiction of this court in similar cases has been affirmed in a line of cases such as People v. American R. Co. 9 Porto Rico Fed. Rep. 579; Scoville v. Soler, ante, 308, and Porto Rico American Tobacco Co. v. Benedicto, ante, 565. These rest upon the principle that an unconstitutional law is

no law, and in attempting to enforce it an official is, to that extent, not acting as an official, but as an individual. This presupposes, however, the unconstitutionality or nullity from some cause in the act in question. There is a long line of decisions connected with interstate commerce, in which Federal courts have taken jurisdiction against state railroad commissions and Federal commissions, which need not be cited here.

2. Commerce may be said to be one of the most important bases of civilized life. A nation may exist without it, as in the instance of China, but national life, in the modern sense of the word, presupposes interchange of commodities and of thought. In fact the ease and rapidity of communication may be said to be the test of civilization. So powerful do corporations and institutions connected with commerce become that in modern times they are everywhere the subject of regulation by the state, where, indeed, they are not actually functions performed by the state authorities. In the United States regulation has so far been preferred to public ownership. When it comes to interstate communication, or what for our purpose is the same thing, communication from Porto Rico to the United States and foreign countries, the need of regulation is all the more apparent. The right to conduct such interchange is in the highest degree a public franchise and subject to regulation by the public. The regulation is sometimes provided for in the act of incorporation or permit to do business, but the two companies now concerned are corporations foreign to the United States and the charters are not in issue. This, however, makes very little difference, because the police power of the state extends to all such matters.

These principles are not open to doubt. It is the question

of who shall apply them that gives rise to the case at bar.  Is the regulation to be by the Interstate Commerce Commission created Feb. 4, 1887, 24 Stat. at L. 379, chap. 104, Comp. Stat. 1916, § 8563, as since amended, or is it to be by the Public Service Commission of Porto Rico created under § 38 of the Organic or Jones Act of March 2, 1917?  The general relation of Porto Rico as a territory to the United States as a sovereign has been discussed in the recent case of Porto Rico American Tobacco Co v. Benedicto, and need not be reiterated; but the mutual relation of these two acts of Congress must be reviewed.

3.  As held in People v. American R. Co. 9 Porto Rico Fed. Rep. 579, the interstate commerce commission applied in Porto Rico even though the Commission did not exercise its jurisdiction and was not aware of it until the Didrickson case. The provisions of this (Interstate Commerce) Act shall "apply to  .  .  .  telegraph, telephone and cable companies, (whether wire or wireless) engaged in sending messages from one state, territory or district of the United States to another state, territory or district of the United States or to any foreign country." 36 Stat. at L. 544, chap. 309, § 7, U. S. Comp. Stat. 1916, § 8563.  This on its face embraces cable companies, and therefore the plaintiffs herein.  There is nothing so far to show that the Interstate Commerce Commission ever took jurisdiction of these companies or that these companies ever made reports or otherwise submitted to such jurisdiction.  The law, however, does not depend upon whether the people accept it or not; indeed its greatest usefulness may be where people do not accept it.  The points in the motion to dismiss based herein are not well taken.  The question is as to the applicability of the law, not its actual application.

Says the Supreme Court in Hopkins v. United States, 171 U. S. 597, 43 L. ed. 297, 19 Sup. Ct. Rep. 40:

"Definitions as to what constitutes interstate commerce are not easily given so that they shall clearly define the full meaning of the term. We know from the cases decided in this court that it is a term of very large significance. It comprehends as it is said, intercourse for the purposes of trade in any and all its forms, including transportation, purchase, sale and exchange of commodities between the citizens of different States, and the power to regulate it embraces all the instruments by which such commerce may be conducted."

It has been held that the telegraph is an instrument of commerce and that telegraph companies are subject to the regulating power of Congress with respect to their foreign and interstate business. Pensacola Teleg. Co. v. Western U. Teleg. Co. 96 U. S. 1, 24 L. ed. 708. A telegraph company occupies the same relation to commerce as a carrier of messages that a railroad company does as a carrier of goods. Both companies are instruments of commerce, and their business is commerce itself. They do their transportation in different ways, and their liabilities are in some respects different, but they are both indispensable to those engaged to any considerable extent in commercial pursuits. Western U. Teleg. Co. v. Texas, 105 U. S. 464, 26 L. ed. 1068. Commerce with foreign countries and commerce among the several states are the same in nature and grow out of the same constitutional grant. Const. art. I, § 8, cl. 3. Commercial intercourse is an element of commerce which comes within the regulating power of Congress. Gibbons v. Ogden, 9 Wheat. 1, 6 L. ed. 23. And these powers are not confined to the instrumentalities in use when the Constitution was adopted,

but keep pace with modern progress and adapt themselves to the new developments of time and circumstances. The importance of the telegraph in particular and the steps of its development are set out in Pensacola Teleg. Co. v. Western U. Teleg. Co. 96 U. S. 9, 24 L. ed. 710, and the same principles and probably the same importance can be attached to the growth of the submarine telegraph, which unifies the world as land telegraph does the different states of the American Union. Laws operating upon private messages sent out of the state amount to a regulation of foreign and interstate commerce beyond the power of the state. Western U. Teleg. Co. v. Texas, supra, 466.

Cable business therefore is a part of interstate commerce and there can be no question that up to the passage of the Jones Act the Interstate Commerce Act applied. Did the Jones Act change the situation?

4. The distance of Porto Rico from the mainland and difference of its economic conditions seem to call for some different regulation, and so Congress in the Jones Act, § 38, declared that "the Interstate Commerce Act and the several amendments . . . shall not apply to Porto Rico.

"The legislative assembly of Porto Rico is hereby authorized to enact laws relating to the regulation of the rates, tariffs and service of public carriers by rail in Porto Rico, and the Public Service Commission hereby created shall have power to enforce such laws under appropriate regulation." [39 Stat. at L. 964, chap. 145, Comp. Stat. —, § 3803 p.] The acts now in question arise subsequent to this law. What is the meaning of the law?

It is suggested that the provision authorizing the legislative assembly to enact laws as to public carriers by rail is to be con-

strued as limiting the preceding part of this same section, that is to say, as limiting the extent of the powers of the Public Service Commission above created. It may well be that the occasion for adding this provision was the special necessity of the separate regulation of railroads, as suggested by the Interstate Commerce Commission itself in its 29th annual report, December 1, 1915. This, however, is not conclusive or perhaps even persuasive. It has been held that the debates of Congress cannot be taken into account as showing the intent of that body in regard to the law which is passed. The question is as to the fair interpretation of the words actually used, not what Congress may have had in mind in adopting the particular words. If the mention of public carriers by rail had been intended as a limitation of the functions of the Public Service Commission it would naturally have been so expressed by the use of the word "provided" or otherwise. As it stands it seems to be a distinct grant of power, and it will not be construed as a limitation.

5. The proper construction of the grant of power in § 38 of the Jones Act depends very largely upon the meaning of the words "Porto Rico." It is declared that the Interstate Commerce Act shall not apply to "Porto Rico," and the regulation of rates of public carriers by rail is necessarily and expressly limited to those in "Porto Rico." There is no reason to suppose that what is included in Porto Rico in this section differs from what is included in Porto Rico in other sections of the act. Section 1. "To provide a civil government for Porto Rico," declares that "The provisions of this act shall apply to the Island of Porto Rico and to the adjacent islands belonging to the United States and the waters of those islands; and the name Porto Rico as used in this act shall be held to include not

only the island of that name, but all the adjacent islands as aforesaid." It is clear that the waters of Porto Rico must be limited to the territorial waters, that is to say, a league from the land. Why Congress should limit the activity of the government to a three mile zone is obvious. No country extends further than this limit. The same is true of every state in the American Union. Porto Rico has never been a state of the American nation, much less an independent state, and has never enjoyed the rights of sovereignty which appertain to the nation at large as to extraterritorial waters. The powers of its government are limited by the Organic Act which that government has seen fit to pass.

The legislation of Porto Rico itself in regard to the Public Service Commission tends in the same direction. The Public Service Commission Act of December 6, 1917, now in question is a law of one hundred and ten sections, in its title "Defining public service companies; and providing for their regulation; prescribing, defining, regulating and limiting their rights, powers and duties; prescribing and defining the powers and duties of the Public Service Commission and its officers, prescribing and regulating the practice and procedure before such commission and upon appeal, and for other purposes." The definition of public service companies is "such natural persons or bodies corporate as may engage in Porto Rico in any of the following pursuits or business . . . telegraph and telephone communications, whether by wire, wireless or by cable." By its terms it is limited not to persons in Porto Rico, but to persons who may engage in such business in Porto Rico. It may be doubted whether this properly includes any business outside of the territorial limits of Porto Rico. The principal instrumentality of

West India & P. Teleg. Co. v. Public Service Commission.

commerce to and from Porto Rico is that of shipping, and the act does not embrace this subject. Upon what principle, therefore, can it be supposed to embrace the lesser instrumentality of submarine cables? It would seem that it has a field of operation in regard to cables laid or to be laid across the rivers and territorial waters of Porto Rico. Nothing in this long act tends to show that the control by the Public Service Commission, or that the scope of the provisions themselves, were intended to transcend the limits of the Island. Sections 2(b), 3(o), 9(b), 10, 24, and 31 refer to cables, but not in any way implying that they are international. The only references to international or interstate commerce are like that in § 24, mentioning local piers for shipping. It may be Congress could make Porto Rico or any other territory its agent to regulate the tariff of a foreign corporation whose cable touches there, but it does not seem to have done so and the legislation even of that agent does not seem to have attempted to cover the point. And in point of fact § 106 as to interstate and foreign commerce shows the contrary, as follows: "Interstate and Foreign Commerce.—The provisions of this act, except when specifically so provided, shall not apply or be construed to apply to commerce with foreign nations or among the several states, except in so far as the same may be made applicable under the provisions of the Constitution of the United States or the Act of Congress."

And not only are interstate telegraph messages not specifically covered by the Public Service Act, but they are expressly reserved for congressional regulation. The Supreme Court holds in Wabash St. L. & P. R. Co. v. Illinois, 118 U. S. 557, 558, 30 L. ed. 244, 1 Inters. Com. Rep. 31, 7 Sup. Ct. Rep. 4: "This court holds now, and has never consciously held

West India & P. Teleg. Co. v. Public Service Commission.

otherwise that a statute of a state, intended to regulate, or to tax, or to impose any other restriction upon the transmission of persons or property or telegraphic messages from one state to another, is not within that class of legislation which the states may enact in the absence of legislation by Congress; and that such statutes are void even as to that part of such transmission which may be within the state."

This is merely an application to telegraphs of principles made applicable to railroads in many other cases. Covington & C. Bridge Co. v. Kentucky, 154 U. S. 204, 38 L. ed. 962, 4 Inters. Com. Rep. 649, 14 Sup. Ct. Rep. 1087; Southern R. Co. v. Reid, 222 U. S. 424, 56 L. ed. 257, 32 Sup. Ct. Rep. 140; Southern R. Co. v. Burlington Lumber Co. 225 U. S. 99, 56 L. ed. 1001, 32 Sup. Ct. Rep. 657; Southern R. Co. v. Railroad Commission, 236 U. S. 439, 59 L. ed. 661, 35 Sup. Ct. Rep. 304; Erie R. Co. v. New York, 233 U. S. 671, 58 L. ed. 1149, 52 L.R.A.(N.S.) 266, 34 Sup. Ct. Rep. 756, Ann. Cas. 1915D, 138.

6. It is quite true that a cable stands, or more strictly speaking lies, in a different condition from other property from its very nature. Regarded as wire and gutta-percha it has practically no value until it is laid at the bottom of the ocean and connected at each end with suitable transmitting instruments on land. Typically it lies in the ocean outside the territorial limits of any nation. Nevertheless it is protected by international law. The ocean is not a No Man's Land, where anyone may take possession of anything he finds there. That is piracy. Not only ships sailing upon the face of the seas, but cables lying at the bottom, are fully protected by international law, treaties, and custom. The ocean is a tract of water held in common by

West India & P. Teleg. Co. v. Public Service Commission.

the nations of the world, to which any one of them can resort
for suitable purposes.  29 Cyc. 1349; United States v. Rodgers,
150 U. S. 253, 37 L. ed. 1072, 14 Sup. Ct. Rep. 109.  The
individual must enforce his property rights there through his
nation.  It is true that a foreigner can come into the courts of
any civilized nation and enforce rights connected with his prop-
erty at sea, but this right is by virtue of treaties between na-
tions.  Everything connected with shipping above and cables
below, therefore, is a matter of national and not local franchise,
and consequently national and not local regulation.  It is true
that for some purposes local regulations prevail when Congress
does not see fit to act.  Pilotage and lighthouse regulations are
instances in point.  On the other hand there are some national
matters which cannot be the subject of local regulation.  Nor-
folk & W. R. Co. v. Pennsylvania, 136 U. S. 114, 34 L. ed.
394, 3 Inters. Com. Rep. 178, 10 Sup. Ct. Rep. 958; Robbins
v. Taxing Dist. 120 U. S. 489, 492, 30 L. ed. 694, 695, 1
Inters. Com. Rep. 45, 7 Sup. Ct. Rep. 592; An interstate
telegraph is such an instance.  Western U. Teleg. Co. v. Texas,
105 U. S. 460, 26 L. ed. 1068; Hopkins v. United States, 171
U. S. 5778, 597, 43 L. ed. 290, 297, 19 Sup. Ct. Rep. 40.

7. It is quite true that the laws applicable to a state are not
always applicable to a territory, for a state is not an instru-
mentality of the nation, but a component part, while on the
other hand a territory is merely a subdivision constituted by
Congress for local purposes, and upon the territory may be con-
ferred whatever powers Congress may think proper for the
more effective execution of even national functions, such as
regulating international cables to Cuba and Santo Domingo.
There certainly is, however, no presumption that Congress is

West India & P. Teleg. Co. v. Public Service Commission.

granting national functions to a local government beyond the terms of the grant itself, or what is necessary for the execution of the power in the grant. It is not to be presumed that Congress is granting to a territory extending three miles into the sea the national regulation of property more than thirteen hundred miles from land, unless Congress distinctly so declares. The only way that this power could be reasoned out as conferred by the Jones Act is to consider the cable, because it begins at Porto Rico, as a kind of tentable or appanage of Porto Rico, extending until it meets some conflicting jurisdiction. In the case of a cable to New York, how far would such power extend? The state of New York, like Porto Rico, has no jurisdiction beyond the 3-mile limit, and yet the cable would be an appanage of the office in New York just as much as it would be an appanage of the office in Porto Rico. Should it be considered in such case that Porto Rico, being the creature of Congress instead of a sovereign state like New York, has inherited the national powers from Porto Rico up to 3 miles from the state of New York? This would be extending the implied territorial powers beyond anything heretofore decided, and beyond any necessity for the government of Porto Rico. It would be adopting for this territory the principle which has been adopted by the Supreme Court of the United States for the nation at large (Wilson v. New, 243 U. S. 332, 61 L. ed. 755, L.R.A. 1917E, 938, 37 Sup. Ct. Rep. 298, Ann. Cas. 1918A, 1024), and would make Porto Rico not only a quasi sovereign as a territory, but more sovereign than a state of the Union.

The acts of the government are in conformity with this principle. The English company operates under a Spanish grant which in itself conferred no rights upon any insular authori-

ties as such. The rights of the French company are quite recent, depending first upon a national grant by the President, itself requiring a permit from the executive council. The Presidential permit fixes the outside commercial rate, and subjects the company to "regulations prescribed by the executive council of Porto Rico from time to time of the terms and conditions of its telegraph service between Porto Rico and the city of New York, including the rates to be charged . . . within the limit above set forth in accordance with the provisions of the Organic Law of the said Island, and also subject to the reserved legislative power of the Congress of the United States."

The local permit from the executive council provides "that within the limitations provided in the permit granted by the United States government . . . the charges of the said grantee for the transmission of messages between Porto Rico and the United States shall be subject to regulation by the executive council according to law." So far as shown, however, there was no such regulation of charges until now by the Public Service Commission. This Commission does not inherit the exact duties of the executive council. Section 38 of the Jones Act gives to the Commission the granting of franchises, and "the said Commission is also empowered and directed to discharge all the executive functions relating to public service corporations heretofore conferred by law upon the executive council," there immediately following the repeal of the Interstate Commerce Act and its congeners. It would seem, therefore, that "the charges of said grantee for transmission of messages between Porto Rico and the United States" are subject to regulation by the Public Service Commission in the same manner as formerly by the executive council, "according to law." This

West India & P. Teleg. Co. v. Public Service Commission.

provision in the Jones Act cannot be considered as an independent grant of power, for it is declared to be "subject to law," that is, subject either to the acts of Congress or to the acts of the Porto Rico legislature on "matters of a legislative character locally inapplicable." This brings us back to the point above discussed, that is to say, that the Public Service Commission is confined to matters in Porto Rico.

Under a reasonable construction the national legislation does not seem to have conferred upon the legislation of Porto Rico powers beyond those necessary for local purposes, and the Interstate Commerce Commission has the same jurisdiction over submarine cables that it had before the passing of the Jones Act.

8. The bill in this case originally alleged in § 8 that the order of the Public Service Commission reducing rates 40 per cent "constitutes an attempt to take their property without due process of law, contrary to the Constitution and laws of the United States." This was afterwards eliminated by amendment. The motion to dismiss now alleges that this eliminates the constitutional provision as to due process of law, and prevents the court from going into the question of the propriety of the rates charged. It would not seem, however, to eliminate the due process clause, for whether the court can investigate the propriety of the charges made or not, the order of the Public Service Commission on its face, according to other paragraphs of the bill, cuts off almost half of the revenue of the cable companies. If the Public Service Commission had the right to reduce rates, the court still would have to consider the propriety of the reduction so as to ascertain whether or not the reduction amounted to confiscation or was otherwise a deprivation of property rights. On the other hand, if, as is now determined, the Public Service

Commission had no such right, the Commission is exercising a function which even more clearly does not belong to it, and under color of office would be depriving the plaintiffs of property without due process of law.

9. The court invited in persons deeming themselves wronged by the reduction of the rates before this amendment to the bill was made. Petitioner, the chamber of commerce, intervened after the amendment was made. How far under the circumstances it can now go into the question of rates by intervention need not be discussed at present. It could probably do so one way or the other as a person injured by the rates, if it proves injury. The rule is that at common law the shipper by a common carrier could sue in the courts for an overcharge. Texas & P. R. Co. v. Abilene Cotton Oil Co. 204 U. S. 426, 51 L. ed. 553, 27 Sup. Ct. Rep. 350, 9 Ann. Cas. 1075. For the purpose of an independent suit, however, there would have to be the requirements as to citizenship and amount involved. The point need not be further discussed at this time.

It follows, therefore, that the Public Service Commission of Porto Rico has not the power to fix cable rates for service outside the 3 mile limits of Porto Rico. It is clear that a reduction of 40 per cent on rates on all commercial messages between the United States and Porto Rico as ordered would exceed its power, and must therefore be enjoined. The motion to dismiss is therefore denied.

It is so ordered.