NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, PROSECUTORS AND DEFENDANTS IN ERROR, v. THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF HUDSON, DEFENDANTS AND PLAINTIFFS IN ERROR.*

Submitted July 12, 1908—Decided June 14, 1909.

GUMMERE, CHIEF JUSTICE (dissenting).   The controversy in this case respects the power of the board of freeholders of Hudson county to fix the rates of ferriage to be charged by the various companies operating ferries across the Hudson river, from points on the Hudson county shore to the city of New York.   Legislative authority to fix such rates has been conferred upon the board, and the validity of such legislation has been affirmed by this court in the case of *Freeholders of Hudson* v. *State,* 4 *Zab.* 718.   The fundamental question which the case presents for decision, as is stated in the majority opinion, is, "Whether the Federal Supreme Court has definitely decided that *the doctrine laid down* in State *v.* Freeholders of Hudson is erroneous;" for, if that doctrine has not been so declared, then the maxim of *stare decisis* should control, and we should follow our earlier decision.

---

*The opinion of Mr. Justice Reed, reversing the judgment of the Supreme Court, is reported in 47 *Vroom* 664.   The above opinion by the Chief Justice dissenting, was omitted through an oversight of the clerk of the court.—REP.

The doctrine laid down in the 4 *Zab.* case and upon which the decision of that case was rested, is thus expressed by Mr. Justice Elmer, who delivered the opinion. After reciting that it was insisted that the ferry in question was a part of the means of carrying on commerce between two states of the union, and that a regulation of the rates of fare for the carrying of passengers and goods was, in effect, a regulation of commerce, which, it was argued, belongs exclusively to congress, he proceeded as follows: "Whether the power of regulating commerce between the states is to be considered as vested exclusively in congress, so that the legislatures of the several states cannot constitutionally pass any law on the subject, although it may not conflict with any existing treaty or law of the United States, has not yet been authoritatively settled by the Supreme Court of the United States. But conceding it to be so, the regulation of the tolls of bridges and turnpike roads, and the fares of railroads and ferries, is in no just sense a regulation of commerce, and has never been so regarded. *It is a part of that general power of police essential to every state, and which could not be with safety, and has not been surrendered to the general government.* That the state may regulate the tolls and fares of turnpikes and railroads and ferries fully within its jurisdiction, counsel have not gone so far as to deny. But such regulations will in many cases affect the commerce among the several states as much as the regulation of tolls at a ferry directly between two states. If the states, separately or jointly, cannot regulate a ferry between two of them, neither can they authorize the building of a bridge or prescribe the tolls for passing it. These and the like powers have been exercised by most of the states of the union without doubt or hesitation from the adoption of the constitution to the present day, and are, in my opinion, in nowise repugnant to the provisions of that instrument."

At the time of the promulgation of this decision (March term, 1853), and later, the comprehensive scope of the commerce clause of the federal constitution was unappreciated by federal as well as state tribunals. In 1861 the Federal

Supreme Court, in the case of *Conway* v. *Taylor,* 1 *Black*
603, expressly affirmed the doctrine of our decision in 4 *Zab.,*
saying: "There has been now nearly three-quarters of a cen-
tury of practical interpretation of the constitution. During
all that time, as before the constitution had its birth, the
states have exercised the power to establish and regulate fer-
ries; congress never. We have sought in vain for any act of
congress which involves the exercise of this power. That the
authority lies within the scope of 'that immense mass of un-
delegated powers' which 'are reserved to the states respec-
tively,' we think too clear to admit of doubt." As late as the
October term, 1881, of that court the same view was expressed
in the case of *Wiggins Ferry Co.* v. *East St. Louis,* 107 *U. S.*
365. About this time, however, the far-reaching importance
of national control over interstate as well as over foreign
commerce began to be generally understood; and nowhere
more completely than in the federal tribunals. Just two
years after the decision in the Wiggins Ferry Company case
the Federal Supreme Court had before it the case of *Glou-
cester Ferry Co.* v. *Pennsylvania,* 114 *Id.* 196, which involved
the right of the State of Pennsylvania to impose a tax upon
the capital stock of a New Jersey ferry company operating an
interstate ferry across the Delaware river between the city of
Camden in the State of New Jersey, and the city of Philadel-
phia in the State of Pennsylvania. The conclusion reached
by the court was that Pennsylvania had no such power. The
ground of its decision is shown by the following extract from
the syllabus of the opinion: "When the subjects of commerce
are national in their character and require uniformity of
regulation, affecting alike all of the states, the power of con-
gress is exclusive. The commerce between the states which
consists in the transportation of persons and property between
them, is a subject of national character and requires uni-
formity of regulation. Congress alone can deal with such
transportation, and its non-action is a declaration that it
shall remain free from burdens imposed by state legislation.
A ferry is a means—and a necessary means—of commercial
intercourse between states bordering on dividing waters, and

it must therefore be conducted without the imposition by the states of taxes or other burdens upon the commerce between them."

Whatever may have been said in this case which is *obiter*, it certainly lays down at least two principles which are fundamental to its decision—*first*, that an interstate ferry is a means of commercial intercourse between the states—a means for transportation of persons and property between them; *second*, that the regulation thereof is a subject of national character.

It is considered in the majority opinion that the declaration of the federal court in this case "did not antagonize any fundamental position upon which the decision in the case of State *v.* Freeholders of Hudson was grounded;" that "the conclusions reached by Judge Elmer were not reached by denying that the business of ferrying was interstate commerce, but by denying that the regulation of the tolls to be charged by a keeper of a ferry residing in this state was inimical to the power of congress to regulate commerce." This assertion can only be justified upon the theory that the regulation of tolls to be charged for the transportation of persons and property between the states is not a regulation of such transportation; a theory which has been entirely exploded by the decision of the United States Supreme Court in the Covington Bridge case, to which I shall presently refer more fully. A comparison of what is said in the two opinions makes this apparent. Judge Elmer declares that "the *regulation of tolls on ferries* which are used for communication and commerce between the states is a part of the general power of police essential to every state, and which could not be with safety, and has not been, surrendered to the general government." If this means anything, it means that such regulation is not a regulation of commerce between the states. The Supreme Court of the United States declared in the Gloucester Ferry Company case that the power to regulate the transportation of persons and property between the states is a subject of national character; and that congress alone can deal with such transportation.

But assuming that the principle underlying the decision in the Gloucester Ferry Company case is not necessarily antagonistic to that upon which Judge Elmer rested his decision in the 4 *Zab.* case, the same cannot be said of the decision in the later case of *Covington and Cincinnati Bridge Co.* v. *Kentucky,* 154 *U. S.* 204, decided nine years after. That case involved the question of the right of the State of Kentucky to regulate the tolls to be charged for the transportation of persons and of property over a bridge spanning the Ohio river between the States of Kentucky and Ohio. The court declared (I quote from the syllabus of the opinion) that traffic across the Ohio river between these two states was interstate commerce; that the bridge which spanned the river was an instrument of such commerce; that a statute of the State of Kentucky which prescribed the tolls which should be charged for passage over the bridge was an attempted regulation of commerce which the state had no constitutional power to make; and that the authority of the state was limited to fixing tolls on such channels of commerce as were exclusively within its territory. It is true, as is stated in the majority opinion in this case, that this decision was by a bare majority of the members of the court; but the view expressed therein is as binding on us as if it had received the fullest approval of every judge who took part in its decision. The principle established by it is that the regulation of the tolls to be charged for the transportation of persons and property over "an instrument of interstate commerce" is a regulation of interstate commerce; and that such a regulation a single state has no power to make. The principle upon which the 4 *Zab.* case is rested is that "the regulation of fares on ferries which are used for communication between the states is a part of the powers reserved to the state, and is not delegated to the general government." It seems to me too plain for discussion that the principle upon which the Covington Bridge Company case rests is absolutely destructive of that laid down by Judge Elmer in the 4 *Zab.* case. But my brethren of the majority say that the federal court in the case last cited from its decision was dealing with a bridge, and not with a ferry,

and therefore it cannot be certain that by their decision they overruled the principle laid down by Judge Elmer that the power to regulate fares on *interstate ferries* was a power not delegated to congress, but reserved to the states. The Supreme Court of the United States declared, in the Gloucester Ferry Company case, that an interstate ferry was an instrument for executing interstate commerce, and this declaration was not *obiter,* but was the underlying principle upon which the decision was rested. In the Covington Bridge Company case it declared that an interstate bridge was, likewise, an instrument of interstate commerce; and in the latter case it further declared that a regulation of tolls to be charged for the transportation of persons and property over an instrument of interstate commerce, was a regulation of commerce which it was beyond the power of a single state to make. If these two cases, taken together, do not absolutely overrule the principle upon which our decision in the 4 *Zab.* case rests, then I am at a loss to perceive how that result can be accomplished by the federal tribunal, except by having before it the question of the power of the State of New Jersey to regulate the rate of ferriage to be charged upon a ferry crossing the Hudson river between that state and the State of New York.

It is suggested that the opinion of the United States Supreme Court in the case of *St. Clair County* v. *Interstate Transfer Co.,* 192 *U. S.* 454 (decided at October term, 1903), indicates that the federal court is prepared to depart, to some extent, from the view expressed by it in the Gloucester Ferry Company and Covington Bridge Company cases. I find no such indication in the opinion, but, if I did, I should not consider that it afforded any justification for a refusal by a state court to follow those decisions. Unless an intimation by a court of doubt as to the soundness of a legal principle which has been established by it in an earlier decision is to be given the same force and effect as an express repudiation by it of that doctrine and the promulgation of the opposite one, the principle declared by the Gloucester Ferry Company case and the Covington Bridge case *is law,* until it is repudiated by the tribunal which established it.

For the reasons which I have given I am compelled to dissent from the conclusion expressed in the majority opinion, viz., "that the decision of this court in the case of State *v.* Chosen Freeholders of Hudson County, which case controls the present, has not been overruled by the Supreme Court of the United States in any decision which makes the present case *res adjudicata* in that court."

The conclusion reached by the majority of this court as to the controlling effect of State *v.* Chosen Freeholders makes a consideration of the scope of the Interstate Commerce act, and its supplement, generally known as the Hepburn act, bootless. For, if "the regulation of the tolls upon ferries which are used for communication and commerce between states is part of the powers reserved to the states and is not delegated to the general government," clearly the legislation adverted to, so far as it attempts to regulate tolls upon interstate ferries (if it has that scope), must be abortive—an unwarranted and unconstitutional infringement upon the rights and powers of this state.

I am authorized to say that Justices Parker, Bergen and Voorhees and Judge Gray concur in the views which I have expressed.