UNITED STATES *v.* DAVIES TURNER & COMPANY, PACIFIC WINE COMPANY (No. 5058)[1]

[1] C.A.D. 784.

United States Court of Customs and Patent Appeals, August 4, 1961

*William H. Orrick, Jr.*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Alan S. Rosenthal* and *Arnold R. Petralia*, trial attorneys, of counsel) for the United States.

*Barnes, Richardson & Colburn* (*Joseph Schwartz*, of counsel) for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[2]

MARTIN, Judge, delivered the opinion of the court:

This appeal is from a judgment of the United States Customs Court, Third Division, Abstract 64376, sustaining two consolidated protests, 58/1955–9666 and 309871–K/8792, against decisions of the Collector of Customs at the Port of Chicago as to certain charges for cartage of "general order merchandise." [3]

The two shipments of merchandise in question here arrived at the Port of Chicago. Entry was not made within the time prescribed

---

[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge* O'Connell, pursuant to provisions of section 294(d) ; Title 28, United States Code.

[3] It appears that "general order merchandise" is any imported merchandise which is taken into custody by the collector under the provisions of Section 490(a) of the Tariff Act of 1930 which reads :

*General orders—Incomplete entry*

(a) Whenever entry of any imported merchandise is not made within the time provided by law or the regulations prescribed by the Secretary of the Treasury, or whenever entry of such merchandise is incomplete because of failure to pay the estimated duties, or whenever, in the opinion of the collector, entry of such merchandise can not be made for want of proper documents or other cause, or whenever the collector believes that any merchandise is not correctly and legally invoiced, he shall take the merchandise into his custody and send it to a bonded warehouse or public store, to be held at the risk and expense of the consignee until entry is made or completed and the proper documents are produced, or a bond given for their production.

by Section 448 of the Tariff Act of 1930 and, in accord with the provisions of Sections 448 and 490 of said Act, both shipments were taken into custody by the collector, sent to the public stores, and held there as unclaimed merchandise. According to Section 490(a), cartage and storage in such a situation must be paid by the consignee when and if entry is finally made.

By authority of Section 565 of the Tariff Act of 1930,[4] the collector had entered into two successive cartage contracts with the Lasham Cartage Company covering fiscal years 1957 and 1958, whereby said cartman agreed to charge a flat rate for cartage of each general order package regardless of its size, weight, and distance to be hauled. Under the terms of both contracts, if the goods are entered, the collector would obtain the cartage charges from the consignee and turn them over to the cartage company. In the event that entry of the general order merchandise is not later made, the cartman would be paid for his services only out of the proceeds of public sale of the merchandise.

The merchandise in Protest 309871–K/8792 consisted of 500 cases of wine which arrived at the 130th Street Dock, Calumet Harbor in Chicago and was carted from there to the Chicago Customs House on September 19, 1956, at a contract charge of $566.50. The merchandise in Protest 58/1955–9666 consisted of 109 cartons of electronic amplifiers which arrived at 79th and Richmond Street, Chicago, and was carted from there to the Chicago Customs House on November 18, 1957, at a contract charge of $140.61.

Entry of the two shipments was finally made and the said contract cartage charges exacted by the collector were paid. The protests in question were filed against these exactions.

After trial, the United States Customs Court, Third Division, C.D. 2126, held that general order cartage charges "shall not be in excess of a reasonable charge for the service performed." After then finding that the appellee-importers had shown "by testimony of qualified witnesses, that the prevailing rates for cartage of such merchandise [as that at bar] by responsible carriers in Chicago from the respective pickup points to the public stores, under the circumstances and at the times of these cartages, were substantially lower than the charges

---

[4] Section 565 reads as follows:
*Cartage*

The cartage of merchandise entered for warehouse shall be done by cartmen to be appointed and licensed by the collector of customs and who shall give a bond, in a penal sum to be fixed by such collector, for the protection of the Government against any loss of, or damage to, such merchandise while being so carted. The cartage of merchandise designated for examination at the appraiser's stores and of merchandise taken into custody by the collector as unclaimed shall be performed by such persons as may be designated, under contract or otherwise, by the Secretary of the Treasury, and under such regulations for the *protection of the owners thereof and of the revenue* as the Secretary of the Treasury shall prescribe. [Emphasis ours.]

the collector required these plantiffs [appellee-importers] to pay," that court stated:

We hold that the flat Lasham contract rate was an unreasonable cartage charge to these plaintiffs. Because the defendant may have been denied opportunity to adduce testimony as to what would be reasonable charges for the cartage services that were performed for the plaintiffs, submission is set aside and the cases are restored to calendar at the next Chicago term, in order to afford the parties opportunity to present further proofs as to what rates would be reasonable.

At the second trial, the appellant-Government declined to submit further evidence. Thereafter, the Customs Court, Abstract 64376, found that the highest reasonable charge for carting 500 cases of wine between the described points was 20 cents per case or $100 for the 500 cases. That court also found that the appellee-importers had made out a prima facie case that a charge in excess of $15 would be unreasonable for the questioned cartage of the 109 cartons of electronic amplifiers, and that the Government had not proved otherwise. Accordingly, the collector was directed to refund to the importers the respective differences between exacted and reasonable cartage charges, namely $466.50 and $125.61.

The Government now appeals from this judgment of the Customs Court.

It appears to us that the importers have the legal right to protest these excessive charges under section 514 of the Tariff Act of 1930 which reads in part as follows:

SEC. 514. PROTEST AGAINST COLLECTOR'S DECISIONS.

* * * all decisions of the collector, including the legality of all orders and findings entering into the same, as to the rate an amount of duties chargeable, and as to all exactions of whatever character (within the jurisdiction of the Secretary of the Treasury), * * * shall, upon the expiration of sixty days after the date of such liquidation, reliquidation, decision, or refusal, be final and conclusive upon all persons (including the United States and any officer thereof), unless the importer, consignee, or agent of the person paying such charge or exaction, or filing such claim for drawback, or seeking such entry or delivery, shall, within sixty days after, but not before such liquidation, reliquidation, decision, or refusal, as the case may be, as well in cases of merchandise entered in bond as for consumption, file a protest in writing with the collector setting forth distinctly and specifically, and in respect to each entry, payment, claim, decision, or refusal, the reasons for the objection thereto. * * *

The pertinent part of protest 58/1955–9666 is as follows: [5]

Notice of dissatisfaction is hereby given with and protest is hereby made against your assessment of excessive cartage charges on General Order No. 1015 Storage & Cartage bill dated 11–21–57, covered by the entries below named, or other merchandise covered by said entries. The reasons for objection under the Tariff Act of 1930, as amended, or as modified by trade agreements or otherwise, are as follows:

---

[5] The same language except for identification numbers and date was used in protest 309871–K/8792.

We claim that only the usual, ordinary and established cartage charges should have been assessed, and that the excessive amount should be refunded.

We further claim that the assessment of duties made herein is illegal and void.

\* \* \* \* \* \* \*

If, under the law, cartage charges such as those involved herein must be reasonable, and we believe they must, *Munn* v. *Illinois*, 94 U.S. 113, 134; *Chicago, Burlington and Quincy Railroad Company* v. *Iowa*, 94 U.S. 155, 161; *Covington and Cincinnati Bridge Co.* v. *Kentucky*, 154 U.S. 204, 222, the question for us to resolve is whether under all the circumstances the charges in this instance fall within that category. It appears to us that the evidence establishing the competitive rates for similar cartage services at least places the burden on the Government to show its charges are reasonable.

According to such evidence in the case at bar, the importer in protest 309871–K was required to pay approximately five and a half times the usual rate to have its 500 cases of wine hauled from the dock to the Customs House, and the importer in protest 58/1955 was required to pay a cartage charge of over eight times the usual cartage charge for having its amplifiers transferred from the railroad to the Customs House. It is obvious that such excessive charges are not justified unless there are circumstances which would alter the situation.

Let us analyze the Government's contention that these charges are reasonable and justifiable. It takes this position because the charges were exacted under a contract authorized by Section 565 of the Tariff Act of 1930, negotiated in accordance with the rules promulgated by the Secretary of the Treasury and awarded to the lowest bidder.

In the first place, it should be remembered that there is nothing in Section 565 requiring a flat fee contract and, in fact, no contract [6] is required at all under this Section since it reads "by contract *or otherwise.*" [Emphasis ours.] Therefore, if the Government could not negotiate a contract whereby the rates under *all* circumstances would be reasonable, it should not have entered into any contract of this nature at all.

The Government maintains that, because of administrative difficulties, a contract for a definite period to cover all its hauling requirements in a particular area is necessary. ▉ We do not believe that administrative inconvenience justifies contracts involving excessive charges which must be paid before a rightful owner can take possession of his property. Furthermore, it is inconceivable to us that a contract could not be negotiated for a definite period which would take

---

[6] We assume that the term "contract" in Section 565 is used in a relatively narrow sense to connote an agreement between the Government and the cartage company to render service of performing all the required hauling for the Government for a specified period since any agreement to perform a particular cartage for a consideration would be a contract.

into consideration the usual factors such as weight, value, number of pieces and distance of haul so that the cartage fees would correspond to those existing in private enterprise and would be reasonable in every instance rather than excessive in some and deficient in others. ▮ Merely because the contracts were awarded to the lowest bidder does not, *ipso facto*, make the charges reasonable.

Furthermore, we are of the opinion that the contract per se is unreasonable since it did not take into consideration the factors usually contemplated in such a contract such as package size, package weight, and distance to be hauled. In fact, the 1957 contract itself states that such factors are not to be considered:[7]

(1) All packages and packed packages of merchandise (irrespective of size, weight, or number, except as indicated in paragraph 2 below [8]) sent, for customs examination, from freight stations and depots, bonded warehouses, docks, or other premises, in the city of Chicago, Illinois, or immediate vicinity, to the United States Customs House, 610 South Canal Street, Chicago, Illinois, or to such other premises in the City of Chicago as the Collector of Customs may direct, at a price of (62¢), sixty-two cents per package. It is understood that, except as specified in paragraph 2, below the term "package" includes crates, cases, barrels, casks, bales, bundles, etc., in fact any container whatever.

The Government further argues that although there is nothing in the statute requiring flat fee cartage contracts, they are necessary because of the credit risk[9] assumed by the cartman. We fail to see that a flat fee contract would minimize the alleged credit risk any more than one based upon more realistic factors. Also, it should be noted that the contract provides for higher charges[10] for unclaimed merchandise. This fact demonstrates that this contract which does not take into consideration the usual factors and results into unreasonable charges is not warranted because of the so-called credit risk involved as counsel for the Government would have us believe since this higher rate for unclaimed merchandise is supposed to compensate the cartman for whatever risk he is taking.

The Government further contends that it was precluded from substantiating its position because it was prohibited from introducing certain evidence by the trial judge.

In the first place, we feel there is sufficient evidence before us to conclude that the rates charged these importers are excessive and unreasonable. Secondly, in setting aside the submission and restoring the causes to the calendar, the lower court gave the Government ample

---

[7] Substantially the same language although a different price is recited in the 1958 contract.

[8] Paragraph 2 provides for a special charge of $12 for cartage of a "van" which is defined as "only a box or packing case which is 10 feet or more in length, or six foot or more in width, *and* comprises at least 216 cubic feet."

[9] This credit risk is alleged to exist because, according to the cartage contract, the cartman may be paid only out of proceeds of public auction sale of unclaimed merchandise.

[10] In the 1957 contract, the charge was sixty-two cents for "merchandise" and one dollar and ten cents for "unclaimed merchandise" for cartage of each package.

opportunity to offer any evidence desired. As pointed out supra, at the second trial, counsel for the Government declined to submit further evidence. Now it is argued before us that the evidence excluded from the first trial would have proved the reasonableness of the contracts and the rates provided therein, and it is claimed that the order restoring the cases to the calendar was so restrictive that it precluded admission of evidence which would substantiate its position. We are of the opinion that under this order, quoted supra, the Government could have introduced any evidence it saw fit to prove "what rates would be reasonable." This certainly would encompass any evidence involving the circumstances, the alleged necessity for flat fee per package rates and the need for a contract for a specified period. Since the Government did not avail itself of this opportunity, we do not believe it should be heard to complain now. Besides, since the contracts, the invitations to bid, and the statements of the Government's witnesses are all before us, we do not believe that further evidence would convince us that such exorbitant charges are justified.

Counsel for the Government further contends that these charges would have been avoided altogether if the importers had entered their merchandise promptly. Rightly so, but there is no statutory authority permitting the Government to exact a penalty for tardy entries.

Counsel for the Government would have us disregard the excessiveness of the rates as they affect the importers in this case and concentrate on the proposition "that the flat rate contract was in the totality of circumstances a reasonable exercise of the collector's authority." The fallacy of this approach is apparent. Reasonableness of the exercise of a Government employee's authority cannot exist if such exercise of authority results in an unreasonable exaction from a citizen as has been proven in this case.

This case may be summed up as follows: Although, because of administration problems and other alleged factors, a charge of somewhat more than the going rate might be reasonable, certainly it is obvious that a charge of 8 times the going rate in one situation, and 5 times in the other, at least places the burden on the Government to show what would be reasonable under the circumstances. The Government was given the opportunity to do so but decided not to avail itself of that opportunity. Therefore this court can render judgment only on the evidence before it which indicates that the importers were required to pay exorbitant charges.

In view of the foregoing, we *affirm* the judgment of the Customs Court. However, it should be noted in doing so we do not thereby hold that "only the usual, ordinary and established cartage charges"[11] can be assessed in similar situations since the Government might be able

[11] See protest, supra.

at some future time to show that a different rate would be reasonable under all the circumstances.

————

Worley, Chief Judge, concurring.

I am not so sure the result here or below would be the same had the Government availed itself of the opportunity to offer additional evidence. I concur in the result solely on the ground the Government failed to overcome the *prima facie* case made by the importers.

————

Smith, Judge, dissenting, with whom Kirkpatrick, Judge, joins.

In dissenting from the majority opinion, I do so because the importers' claim seems to me to be defective for two reasons: First, the importers have failed to state a legal ground upon which relief can be granted. Second, even if importers' case can be interpreted as stating a legal ground upon which relief can be granted, they have failed to establish any proper basis for a recovery.

With respect to the first defect, the importers here have protested on the basis that the collector charged too much for cartage of the unentered goods. While the majority apparently considers this an adequate legal basis for the protest, I do not. Here, as in any other protest, the importers must base their claim either on the failure of the collector to act in compliance with the applicable law and regulations, or that the applicable laws or regulations were invalid. It is well established in numerous decisions of this court [12] that the collector is presumed to have acted lawfully, and that this presumption places a two-fold burden on the protestant to prove (1) that the collector erred and (2) that the protestant's contentions are correct.

Here the importers allege neither invalidity of the applicable statutes and regulations, nor failure of the collector in any respect to comply fully with these statutes and regulations. Appellees do not deny liability for the expense of having the collector take custody of the goods, send them to the warehouse and hold them, nor do they challenge the validity of the statutes and regulations under which the collector acted. Appellees do not dispute the statutory grant of authority to the Secretary of the Treasury to promulgate regulations governing the procedures for the taking of unentered merchandise and its transportation and storage.

Appellees admit that the collector at all times acted in compliance with the regulations. The court below found that the contract under which these goods were handled was valid. No error in calculating the charges under the contract is alleged. The only error charged is that the admittedly authorized acts of the collector became, in the

[12] *Atlantic Aluminum & Metal Distributors, Inc. v. United States,* 47 CCPA 88, C.A.D. 735 and cases there cited.

present instance, unauthorized because of the importers' assertion that they could have had the merchandise carted for less money than the collector charged them.

If the importers' legal rights have been invaded, it is incumbent upon them to establish the right invaded and the wrong committed. Here appelles have admitted liability and allege no wrong doing of the collector except for charging the flat rate cartage fee established by the general order cartage contract which the collector, acting under established regulations, had entered into with the cartage company. Therefore, it seems to me the importers have failed to state a cause of action upon which relief should be granted.

The majority cites *Munn* v. *Illinois*, 94 U.S. 113; *Chicago, Burlington and Quincy Railroad Company* v. *Iowa*, 94 U.S. 155; and *Covington and Cincinnati Bridge Co.* v. *Kentucky*, 154 U.S. 204, as authority for the proposition that the importers' legal right here grew out of some rule of an undefined origin that the charges of the collector must be "reasonable." The *Munn* case holds that where the legislature has established maximum warehouseman's rates as "reasonable," the court may not look behind that determination. To the extent that that proposition has any application here, it seems to me it must prohibit a court from examining into the reasonableness of the amount of the charges assessed under the conditions here. The *Quincy Railroad Company* case involves the same problem as applied to railroads. The *Covington Bridge Co.* case turned on whether the State of Kentucky was attempting to regulate interstate commerce. I fail to see how these cases, dealing generally with the powers of states to regulate private enterprise, help to resolve the issues here.

With respect to the second defect, even assuming that the importers have a cause of action, they have failed to establish by competent evidence any factual basis for the recovery claimed.

The importers presented two witnesses who testified as to what the importers would be charged by a trucker acting under a private contract to transport the specific goods. No effort was made to prove what it would have cost the importers under a one-year general order cartage contract entered into under the admittedly valid regulations. The "expense" contemplated by the statute is that arising out of such a contract when the collector decides to let such a contract. Likewise, no evidence was introduced to indicate what cartmen would charge the importers on the basis of such a contract which requires the cartman to haul any goods at any time to any place for anyone; to bear absolute liability for loss or damage; to reimburse the collector for cartage fees incurred by reason of failure of the contracting cartman to remove the goods within the time limit fixed by the contract; to absorb the cartage fees if the importer fails to claim his goods within one year; to be bonded; and to do all the foregoing under a

contract which terminates if the cartman ever performs his duties negligently.

The statute makes an importer liable for the expense of such services. No evidence has been produced here by the importers to show that the amount charged to them for such services was unreasonable. It is improper, it seems to me, to evaluate the "reasonableness" of the charge for such services on the basis of the testimony of importers' witnesses as to what they or their competitors would charge for a different service.

The importers could have avoided all of the charges now claimed to be "unreasonable" simply by entering the goods or securing an extension of time therefore any time until five o'clock on the evening of the second work day after the date the goods were unladened. So far as it appears from the record here, no effort was made by the importers to do either. Thus the importers in effect "dumped" their goods into the care and custody of the collector, thus making the collector an involuntary bailee, a common carrier and a warehouseman for the importers. It is only fair to require the importers, rather than the Government, to pay for such services.

If, as asserted by the importers, the amount charged for such services was "unreasonable," it was incumbent upon them to show that the "unreasonableness" was not merely in the amount assessed under the annual general order cartage contract but that it arose out of an error of the collector or that the statute or regulation under which he acted was invalid. Failing to do so, I do not see how the importers are entitled to recover.

The fact that the Government elected not to introduce testimony on the "reasonableness" of the charges seems to me to be beside the point. The contract here in issue seems to be the best evidence on this point. Since no issue is raised by the importer, we must assume that all of the provisions of the statute and of the applicable regulation were complied with. The statute and the regulation requires that such a contract be entered into only after bids had been requested and then to be entered into with the cartage company having the lowest bid. Where those aspects of the contract have not been challenged, it seems to me the Government properly stood on the contract.

The error in the majority opinion seems to me to be evident in its anomalous result. By the decision of the majority the collector is required either to charge less than the "expense" as required by the statute, or he is required to exceed his authority under the statute and regulations to reduce the "expense" to the amount which the majority thinks is "reasonable." In either event, the majority opinion requires the collector to act contrary to the statute and the customs regulations promulgated thereunder.

I would, therefore, reverse the decision below.